UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BERNARDO VALENTINI and WINDSOR INTERNATIONAL INVESTMENT CO., f/k/a WINDSOR INTERNATIONAL INVESTMENT CORP., | ) ) ) ) | Civil Action Docket No. 11-CV-1355  (LBS) |
| | ) | **COMPLAINT** |
| Plaintiffs, | ) ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | ECF CASE |
| CITIGROUP, INC., CITIGROUP GLOBAL MARKETS, INC., CITICORP FINANCIAL SERVICES CORPORATION, k/n/a CITI INTERNATIONAL FINANCIAL SERVICES, LLC, CITIBANK, N.A. and CITI PRIVATE BANK, | ) ) ) ) ) ) ) | |
| Defendants. | | |

## I.

## INTRODUCTION

Wall Street's practice of dumping bad products on Main Street investors continues despite condemnation of this practice in decades past.  "Wall Street firms periodically use their own clients . . . as a dumping ground for defective products they cook up in their home offices and then pitch worldwide to their financial advisors and clients."  This practice continues because it is so profitable for brokerage firms to engage in these unsavory practices.  The current structured product version of this practice simultaneously enables the financial industry to borrow billions of dollars from main street investors with no collateral.  As a result, the brokerage firms not only profit from creating and selling these structured notes, they also

effectively receive loans from their own clients on terms so favorable that professional lenders would never consider them.[1]

## II.

## NATURE OF THE ACTION

This action is brought to obtain redress for Plaintiffs Bernardo Valentini ("Valentini") and Windsor International Business Corp., f/k/a Windsor International Investment Corp. ("Windsor") (collectively "Plaintiffs"), who have been victimized and financially damaged by a course of deceptive and dishonest conduct by Defendants, their employees and agents. Defendants misused Plaintiffs' funds for the purchase of very high risk instruments known as reverse exchangeable securities, commonly called "reverse convertibles," that were wholly inappropriate for unsophisticated investors like Plaintiffs. Plaintiffs' funds were to be put into conservative investments, when and upon Plaintiffs' instructions, so as to preserve the funds for the Valentini family's future financial security. By virtue of Defendants' deceptive and dishonest conduct, Plaintiffs have suffered losses exceeding $24 million on their investments. Plaintiffs therefore bring causes of action for breach of contract, breach of fiduciary duty, unjust enrichment, negligence, negligent misrepresentation, negligent supervision, conversion, violation of Rule 10b-5 under § 10(b) of the Securities Exchange Act of 1934, violation of § 215 of the Investment Advisors Act of 1940 and common law fraud.

---

[1] Lehman Principal Protected Notes Investor Awarded $2.2 Million in FINRA Arbitration, http://www.lehmannotes.com/lehman-notes/ (Dec. 23, 2010, 8:53 EST).

## III.

## <u>THE PARTIES</u>

1.     Plaintiff Valentini, 59, is a Brazilian citizen who currently resides in Curitiba, Paraná, Brazil.  Valentini holds a Bachelor's degree in accounting and a Master's degree in business administration and is self-employed as a businessman in the area of industrial construction.  Valentini is a family man with three grown children and several grandchildren.  He has worked his whole life to support his family and save money to ensure their future financial security.  Valentini does not speak English and relies on banks and trusted financial institutions to guide his investments.

2.     Plaintiff Windsor was formed under the laws of the Commonwealth of the Bahamas on or about April 20, 2007 as a trust for the sole purpose of investing Valentini's patrimony funds in conservative securities to be recommended by Defendants.  Patrimony funds are those established for the future security of the family.

3.     Defendant Citigroup, Inc. is a diversified financial services holding company that provides a broad range of financial services to consumer and corporate customers around the world.  Citigroup's services include investment banking, retail brokerage, corporate banking, and cash management products and services.  Citigroup's principal place of business is located at 399 Park Avenue, New York, New York 10043.

4.     Defendant Citigroup Global Markets Inc. ("CGMI") is the brokerage and securities arm of Citigroup.  CGMI provides investment banking and advisory services to corporate, institutional, government, and retail clients.  As a broker-dealer, CGMI offers clients access to the global markets in more than 100 countries.  Services include underwriting,

3

structuring, sales and trading across such asset classes as equities, corporate, government and agency bonds, and mortgage-backed securities.  CGMI's principal place of business is located at 388 Greenwich Street, New York, New York 10013.  CGMI is registered with the Securities and Exchange Commission ("SEC") and regulated by FINRA New York office.

5.      Defendant Citicorp Financial Services Corporation ("CFSC"), now known as Citi International Financial Services LLC ("CIFS"), is a subsidiary of CGMI formed in Puerto Rico on August 10, 1970.  CIFS is and was at all times relevant herein a brokerage firm and an investment adviser firm.  CIFS's principal place of business is located at Santa Marina I Building Suite 200, 400 St C, Rexco Park, Guaynabo, PR 00968.  CIFS is registered with the SEC and regulated by FINRA Florida office.

6.      Defendant Citibank, N.A. ("Citibank") is the consumer banking arm of Citigroup. Citibank has retail banking operations in more than 100 countries and territories around the world.  Citibank conducts business in Brazil through Banco Citibank S.A.  Citibank's principal place of business is located at 399 Park Avenue, New York, New York 10043.

7.      Defendant Citi Private Bank ("CPB") is a subsidiary of Citibank that provides personalized wealth management services for affluent clients in 23 countries.  CPB's principal place of business is located at 399 Park Avenue, New York, New York 10043.  CPB acts through Citibank, its affiliates and/or subsidiaries.

## IV.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action pursuant to the

following statutes:

   a.     12 U.S.C. § 632, which provides federal court jurisdiction over any suit of
          a civil nature to which a corporation organized under the laws of the
          United States is a party, arising out of transactions involving international
          or foreign banking, or out of other international or foreign financial
          operations;

   b.     28 U.S.C. §1331, which provides federal court jurisdiction over suits
          arising under the laws of the United States;

   c.     28 U.S.C. §1332, which provides federal court jurisdiction of all civil
          actions where the matter and controversy exceeds the sum or value of
          $75,000, exclusive of interest and costs, and is between citizens of a
          foreign state, as defined in 28 U.S.C. 1603(a), as plaintiff, and citizens of a
          State; and

   d.     28 U.S.C. § 1367, which provides for supplemental federal court
          jurisdiction in which the district courts have original jurisdiction over all
          claims that are so related to claims in the action that the form part of the
          same case or controversy under Article III of the United States
          Constitution.

   e.     15 U.S.C. § 80b-14, which provides for jurisdiction of offenses and suits
          under the Investment Advisors Act of 1940,15 U.S.C. § 80b-1 *et seq.*

9.     Venue lies in this district pursuant to 28 U.S.C. §§1391(a)(1), 1391(a)(2),

1391(b)(1), 1391(b)(2), and 1391(c).

**V.**

**BACKGROUND OF STRUCTURED PRODUCTS**

A.      **The Mechanics of Reverse Convertible Notes**

10.      Structured securities products are used to facilitate highly customized risk and return objectives.  To accomplish the risk and return objectives, a traditional security, such as a conventional bond, is paired with an underlying asset.  The usual payment features of a conventional bond, periodic coupons and final principal are replaced with non-traditional payoffs derived from the performance of one or more underlying assets.

11.      Single securities, a basket of securities, options, futures, and swaps, some or all of which are traded on national exchanges, are examples of some of the derivative product investments underlying structured products.  The risk associated with the underlying product determines the risk associated with the structured product.

12.      Reverse Convertible Notes ("RCN"), also known as "rev cons," "revertibles" and "reverse converts," are complex structured financial products that consist of a high yield short term note of the issuer linked to the performance of an unrelated reference asset, usually common stock, a basket of stocks, an index, or another instrument that is traded on a national securities exchange.

13.      RCNs are promoted to the retail customer on the basis of having higher coupon rates than other conventional debt instruments with a similar maturity or securities of an issuer that have a comparable debt rating.  For example, RCNs are promoted in some cases to have an annualized coupon rate of 20 percent or more.  An initial investment unit for an RCN is usually $1000 per issued security.  Most RCNs have maturity dates ranging from three months to two

6

years.  RCNs are also promoted by brokers because of high commission rates which often exceed 2%.

14.     Higher coupon rates reflect the high risk associated with RCNs.  It is possible that investors will not receive the full return of their principal if the value of the reference asset has fallen below a certain level, known as the "knock-in" level.

15.     At the time that the RCN is sold, the issuing bank sets the "knock-in" level of the RCN.  The knock-in level is a dollar price that is typically set to between 50% and 70% of the price of the underlying security at the time of the issue (the "initial reference price").  Investors will receive their full interest and principal re-payment on the RCN as long as the reference security remains above the knock-in level. Because the knock-in level is set below the then-current price of the stock, it has the appearance of protecting investors from declines in the price of the underlying security.  While it does serve to protect against small declines in the underlying security, the knock-in level is set such that there is a significant likelihood that the underlying security will pierce the knock-in boundary.  The likelihood of such an occurrence is exacerbated because the underlying security (or in some cases small basket of securities) is undiversified and exhibits high volatility.

16.     The knock-in level will cause one of the following possible outcomes:

   a.     If the value of the underlying asset does not go below the knock-in level and stays above the initial reference price at or before maturity then the investor will receive the principal plus the coupon rate;

   b.     if the underlying investment falls below the knock-in level before maturity, but rebounds above the initial reference price before maturity then the investor will receive the principal of the note plus the coupon rate; or

7

      c.      if the value of the underlying asset goes below the knock-in level, and stays below the knock-in level at maturity, the investor will then own the underlying asset at the lowest price of the lowest performing underlying asset in the case of a basket or reference securities.

17.     The following examples illustrate possible potential outcomes of an RCN investment:

      a.      If the underlying reference asset does not drop below the knock-in level, or stays the same in value, an RCN will work as follows.  The investor buys an RCN for $1000 that pays a 20% per year coupon rate, with downside protection of 20%, and the stock that is linked to the RCN is trading at $100 a share, and this share price does not drop below the initial reference price.  The investor will receive $1,200, which is the principal plus 20% interest.

      b.      however, if the price at maturity is below the knock-in level, for this example below $80 per share to $70 per share, the investor receives the number of shares of stock he would have bought at the time of the issue. In this case the investor would receive 10 shares ($1,000 divided by $100) or stock in the underlying worth $700.  The investor does not receive any interest.  In this case, even with the high coupon rate, the investor will have lost $300 on the initial investment and own shares of a corporation that the investor may not want.

## B.    <u>The Negative Effects of Reverse Convertible Notes</u>

18.     The high probability that the investor will lose his initial investment is not the only risk that investors face when investing in RCNs.  In February, 2010, the Financial Industry Regulatory Authority (FINRA published an "Investor Alert" warning investors of the risks associated with RCNs.  FINRA warned investors that the complexities of RCNs make them hard for investors, and even investment professionals, to fully understand and evaluate.

19.     RCNs expose investors to two sets of risks.  Investors are exposed to the risks traditionally associated with fixed income products, such as issuer default, *and* the risk of the

unrelated, underlying asset.  The following are some of the risks associated with an investment in

RCNs:

    a.    **Exposure to the risks associated with the underlying asset.**  The investor is exposed to the risks associated with the underlying asset.  For example, J.P. Morgan issued an RCN with the underlying asset stock in a corporation involved in litigation.  The events in the litigation have significantly influenced the stock price of the corporation.  The RCNs issued were essentially bets that the corporation would be successful in the litigation.  The litigation events that occurred during the life of the RCN caused the underlying stock price to dip below the knock-in level, and exposed the investors to the possibility of having to buy stock in a corporation that is destroyed in litigation.

    b.    **Exposure to Selling Put Options.**  An RCN is a simultaneous purchase of a note from the issuer and put option sold to the issuer.  Because the investor is selling a put option, an RCN investor may be forced to buy an underlying asset that they do not want at a price higher than they are willing to pay.

    c.    **Exposure to an Illiquid Asset.**  The secondary market for the sale of an RCN is limited.  The issuer of the RCN is not required to maintain a secondary market for the sale of the RCN.  Because of the lack of a secondary market for the sale of an RCN, an investor will not be able to easily turn the RCN into cash.

    d.    **Exposure to the Issuer's Default on the Note.**  An investor in an RCN is exposed to the possibility that the issuer of the note will not be able to meet its debt obligation when it comes due.

    e.    **Exposure to Call Risk.**  Some RCNs have "call provisions" which allow the issuer, at its sole discretion to redeem the investment before it matures.  The investor would not receive any subsequent coupon payments as promised and would immediately receive the principal in *either cash or stock.*

    f.    **Exposure to Potential Loss of Principal.**  RCNs are unsecured debt instruments that offer no principal protection.  If the underlying asset falls below the knock-in level, the investor could potentially face loss of their entire principal invested.  If the underlying asset falls below the knock-in level, the investor could receive shares in a company on the verge of declaring bankruptcy or is unsuitable for their investment needs.

g.     **Exposure to Conflicts of Interest.**  The issuer of the RCN may engage in business activities, such as investment banking or asset management, with the company whose stock is the underlying asset.  The issuer's business involvement with the company could potentially harm the stock price of the underlying asset.

h.     **Exposure to an Inflated Investment Price.**  Because RCNs have complex payoffs, are not fully understood by investors, and lack a secondary market to correct mispricing, they are sold at inflated prices.

i.     **No Exposure to Appreciation of the Underlying Asset.**  If the underlying asset appreciates in value, the investor will not benefit.  If the underlying asset appreciates, the investor will only receive the coupon rate plus principal.

**C.**     <u>**What Did Citigroup Sell to Plaintiffs?**</u>

20.     Between September 2006 and December 2008 Citigroup sold several different types of structured financial products to Plaintiffs.  Most of the products were auto-call notes, barrier notes, or equity-linked securities ("ELKS").  All of these products have payments that are based on the performance or value of a single underlying security or a basket of underlying equity securities.

21.     **Auto-call notes** are automatically called away from the investor if the underlying securities have appreciated since the issue date.  When they are called, they may pay a coupon to the investor.  If they are not called, it means that one of the underlying securities has declined in value.  In most cases, if there has been a drastic decline (over 30%), the investor will suffer the same loss as the worst performing security in the basket.  For example,

| Societe Generale AMD-BSC-GM Airbag Autocall Notes 2007-234 (Common Code:  33227655) | | | |
|---|---|---|---|
| Issue Date: | 11/26/2007 | Purchase Price: | $1,000 |
| Purchase Date: | 11/26/2007 | Fair Purchase Price: | $859.32 |
| Maturity Date: | 12/4/2009 | | |

The Product is Callable on a Quarterly Basis:

a.    If all three reference assets have positive cumulative returns on a quarterly valuation date, the product will be called and investors will be paid a premium equivalent to an 83.2% annualized return.

b.    The last valuation date is November 27, 2009.

If the Product is Never Called, Then at Maturity:

a.    Investors will be paid a 12.5% premium (6.25% annualized premium).

b.    In addition to the premium at maturity, if one or more of the three reference assets have a cumulative return worse than -30%, investors will suffer the same percentage capital loss as the worst-performing reference asset.

Plaintiffs lost $2,536,500 on this investment

22.    For another example,

| Societe Generale AMD-BSC-GM Airbag Autocall Notes 2007-235 (Common Code:  33227469) | | | |
|---|---|---|---|
| Issue Date: | 11/26/2007 | Purchase Price: | $1,000 |
| Purchase Date: | 11/26/2007 | Fair Purchase Price: | $898.10 |
| Maturity Date: | 12/4/2009 | | |

The Product is Callable on a Quarterly Basis:

a.    If all three reference assets have positive cumulative returns on a quarterly valuation date, the product will be called at par.

b.    The last valuation date is November 27, 2009.

11

The Product Pays Quarterly Conditional Coupons:

a. If none of the three reference assets have cumulative return worse than -30% on a quarterly valuation date, investors receive a 64.2% annualized coupon.  Otherwise, the coupon is not paid nor accrued.

If the Product is Never Called, Then at Maturity:

a. If one or more of the three reference assets have cumulative return worse than -30%, investors will suffer the same percentage capital loss as the worst-performing reference asset.  Otherwise, the product's face value is returned.

| Plaintiffs lost $2,969,100 on this investment |
| --- |

23.     **Barrier notes** pay investors coupons that are based on whether the underlying security has risen or fallen past a specific point (the barrier) since the issue date of the structured product.  If the security has risen, the investor will be paid the coupon.  If it has fallen, the investor will suffer a loss tied to the decline of the underlying security.  For example,

| Citibank AIG Coupon Barrier Auto-Call Notes | | | |
| --- | --- | --- | --- |
| Issue Date: | 7/9/2008 | Purchase Price: | $10,000 |
| Purchase Date: | 7/10/2008 | Fair Purchase Price: | $8,527.53 |
| Maturity Date: | 8/6/2010 | | |

The Product Pays a Coupon Every Two Months:

a. Every two months, investors receive a 31.1% annualized coupon.

b. The last valuation date is July 23, 2010.

The Product is Callable at Each Coupon Pay Date:

a. If AIG has a positive cumulative return on a valuation date, the product will be called at par.

If the Product is Never Called, Then at Maturity:

12

     a.      If AIG has a cumulative return worse than -50%, investors will suffer the same percentage capital loss as AIG.  Otherwise, the product's face value is returned.

| Plaintiffs lost $1,276,080 on this investment |
|:---:|

24.     **ELKS** are similar to barrier notes, but usually allow the investor to participate in some of the upside of the appreciation of the underlying security or securities.  However, many of the ELKS sold to Plaintiffs did not.  This type of product is generally called a "reverse convertible," "reverse exchangeable," "RevCon" or something other than an ELKS.  Labeling this product an ELKS is intentionally misleading.  For example,

| Allegro Investment Corporation ELKS Based Upon a Basket of Three ADRs (Companhia Vale do Rio Doce, TAM, and Gerdau) | | | |
|---|---|---|---|
| Issue Date: | 7/10/2007 | Purchase Price: | $10,000 |
| Purchase Date: | 7/10/2007 | Fair Purchase Price: | $9,706.72 |
| Maturity Date: | 10/10/2010 | | |

At Maturity:

     a.      The Product Pays a 31.75% Annualized Coupon.

     b.      If any of the three reference assets ever lost more than 20% of its value during the ELKS' term, then investors will suffer the capital loss of the worst-performing reference asset at maturity.  If all three of the reference assets have capital gains at maturity, investors will instead receive the product's face value.

| Plaintiffs lost $888,715 on this investment |
|:---:|

25.     In sum, an investment in reverse convertible notes is "really no different than rolling the dice."  Reverse convertible notes are speculative, high-risk investments that are totally inappropriate and unsuitable for most income-oriented investors like Plaintiffs.[2]

## VI.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

26.     Starting in the early '90s Valentini transferred some of his accounts to First Pine Bank of the Caymans ("First Pine") for safety and tax purposes.  First Pine recommended that Valentini invest primarily in Brazilian government debt and certificates of deposit that returned 7% year.  These investments were moderately successful.

27.     In late 1999, Valentini transferred $8,400,000 to HSBC Investment Bank Brasil SA ("HSBC") to help out a friend, Ricardo Ghilardi ("Ghilardi"), who had recently joined HSBC to work with clients who had investments outside Brazil.

28.     In or about April 2001, Ghilardi left HSBC and joined Citibank in Curitiba, Brazil in the consumer area.  Shortly thereafter, in or about August 2001, Ghilardi moved to CFSC where he worked as a FINRA registered broker (CRD #17053).[3]  In or about June 2006, CFSC transferred Ghilardi to its branch located in Guaynabo, Puerto Rico.

29.     In or about May 2002, Valentini transferred $8,400,000 to CFSC so that Ghilardi could manage Valentini's money with the goal of increasing his savings and patrimony.  This transfer was in addition to the $2,463,000 that Valentini had already invested with CFSC.

---

[2] Posting of Page Perry LLC to Investment Fraud Lawyer Blog,
http://www.investmentfraudlawyerblog.com/2010/05/reverse_convertible_notes_can.html (May 17, 2010).
[3] FINRA records show that Ghilardi held a FINRA registration with CFSC from October 2001 through March 2008.

30.     By mid-2006 Valentini's entire investment portfolio (spread among three banks) had grown to approximately $43 million through what he believed to be a conservative investment strategy.  Up to this point none of Valentini's investments had suffered a loss.

31.     By September 2006 the investments in Valentini's CFSC account had grown to approximately $17,800,000 through what he believed to be conservative investments like Brazilian government bonds and Brazilian state-owned companies.

32.     In September 2006, Ghilardi first offered to sell Valentini a more "lucrative" investment known as "structured notes."  Ghilardi represented that CFSC had structured note "experts" who would ensure that Valentini did not lose any of his money on these investments. Ghilardi assured Valentini that structured notes were "safe because they had a barrier of protection" in the note.  In other words, Valentini's principal investment would be protected from losses.  Valentini relied on Ghilardi's promises, particularly his assurance that CFSC's experts would protect Valentini's investment because of their superior knowledge and experience.  What Ghilardi failed to disclose to Valentini was the fact that these so-called principal protected notes as well as other structured notes promoted by CFSC, were in fact risky, unsecured loans to the notes issuers.

33.     According to FINRA Regulatory Notice 10-09, before recommending a reverse convertible to a retail customer like Valentini, a registered representative, *i.e.* Ghilardi, should discuss the product with the customer to ensure that the customer makes an informed decision about whether to purchase the reverse convertible.  The registered representative and retail customer should discuss such matters as the following:

> ➢ How the product works, including its payout structure, relevant information about the reference asset and, if applicable, that the investor will not participate in any appreciation in the value of the reference asset;

> ➢ The fact that the principal value of the investment is not guaranteed and the customer might suffer a loss on the investment;

> ➢ The ability of the investor to sell the product prior to maturity, and the potential sales price, may depend on the willingness of the issuer or another party to maintain a secondary market; and

> ➢ If applicable, the fact that the firm has published its own research reports regarding the reference asset, the content of that research and how the research is or is not relevant to a recommendations to purchase or sell the reverse convertible.

Ghilardi discussed none of these matters with Valentini prior to his purchase of **any** structured note from CFSC.

34.     Furthermore, NASD (now FINRA) Rule 2310 requires that, before recommending the purchase or sale of a security, firms must have a reasonable basis for determining that the product is both suitable for a least some investors, and suitable for each specific customer to whom it is recommended.  Reverse convertibles have features that do not make them suitable for every customer type.  They have complex pay-out structures involving multiple variables that can make it difficult for registered representatives and their customers to accurately assess their risks, costs and potential benefits.  As a result of these features, the 2005 Notice to Members 05-59, suggested that firms limit sales to sophisticated customers who qualified for options trading or have a substantially equivalent limitation on sales to customers who could understand the complexity of reverse convertibles and could withstand the risks.

16

Ghilardi had no reasonable grounds to believe that the recommended sales of RCNs were suitable for Valentini.

35.     Based on Ghilardi's recommendation and representations, in or about mid-September 2006 Valentini agreed to invest in a structured note offered by CFSC.  To pay for the investment Ghilardi advised Valentini to sell about $17,800,000 worth of his conservative investments, namely eurobonds, funds administered by CFSC, and investment funds of shares of S&P 500 companies that paid dividends of approximately 7% per year.

36.     On September 21, 2006, Valentini purchased a structured note from CFSC in the principal amount of $17,800,000 issued by Allegro Investment Corporation S.A., Luxembourg, *to wit*:

> Allegro Investment Corporation S.A., Luxembourg Equity Linked Securities (ELKS) Based Upon a Basket of Three ADRs due December [28], 2006."  The Underlying Basket consisted of the American Depository Receipts ("ADR") of the following three companies:  Companhia Siderurgica Nacional S.A. (SCN) ("SID"), Banco Bradesco S.A. ("BBD"), and Companhia Vale do Rio Doce (CVRD) ("RIO").

Neither Ghilardi nor CFSC delivered a prospectus or any other documentation to Valentini describing the product prior to his purchase.

37.     On or about December 22, 2006, immediately prior to the structured note's maturity, Ghilardi phoned Valentini.  He told Valentini that the first structured note was going to be successful and advised him to buy more structured notes with the money he would make from the maturation of the first note.  Ghilardi represented that he had three structured notes at a price of $6,470,000 each (total of $19,410,000) for Valentini to buy that he guaranteed would be 100%

successful.  To pay for the investment Ghilardi advised Valentini to reinvest the profit he made

from the September 21, 2006 structured note *plus* liquidate the balance of his entire portfolio.

       38.     Based upon Ghilardi's recommendation and representations on or about

December 22, 2006 Valentini purchased three more structured notes as follows:

      a.     Allegro Investment Corporation S.A., Luxembourg Equity Linked Securities (ELKS) Based Upon a Basket of Three ADRs due April 10, 2007.  The Underlying Basket consisted of the American Depository Receipts ("ADR") of the following three companies:  Companhia Vale do Rio Doce (CVRD) ("RIO"), Banco Bradesco S.A. ("BBD"), Gerdau S.A. ("GGB");

      b.     Allegro Investment Corporation S.A., Luxembourg Equity Linked Securities (ELKS) Based Upon a Basket of Three ADRs due April 10, 2007.  The Underlying Basket consisted of the American Depository Receipts ("ADR") of the following three companies:  Petroleo Brasileiro S.A. ("PBR"), Companhia Siderurgica Nacional S.A. (CSN) ("SID"), Gerdau S.A. ("GGB"); and

      c.     Allegro Investment Corporation S.A., Luxembourg Equity Linked Securities (ELKS) Based Upon a Basket of Three ADRs due April 10, 2007.  The Underlying Basket consisted of the American Depository Receipts ("ADR") of the following three companies:  Companhia Vale do Rio Doce (CVRD) ("RIO"), Banco Bradesco S.A. ("BBD"), Companhia Siderurgica Nacional S.A. (CSN) ("SID").

Neither Ghilardi nor CFSC delivered a prospectus or any other documentation to Valentini

describing the products prior to his purchase.

       39.     On or about March 22, 2007, Ghilardi pushed Valentini to buy another structured

note.  This time Valentini spent $20,640,000 to purchase:

      a.     Allegro Investment Corporation S.A., Luxembourg Equity Linked Securities (ELKS) Based Upon a Basket of Three Stocks (PBR-BBD-F) due July 10, 2007.  The Underlying Basket consisted of shares of common stock or of American Depository Receipts ("ADR") of the following three companies:  Petroleo Brasileiro S.A. ("PBR"), Banco Bradesco S.A. ("BBD"), Ford Motor Company ("F").

Neither Ghilardi nor CFSC delivered a prospectus or any other documentation to Valentini describing the product prior to his purchase.

40.     In early 2007 Valentini decided to create a trust for his patrimony funds to protect his investments for his family.  He hired Santander Bank & Trust ("Santander") to administer the trust and with Santander's help created Windsor on April 20, 2007.

41.     In or about early May 2007, Leandro Milititsky ("Milititsky") and Vanessa Leone ("Leone"), private bankers with The Citigroup Private Bank, personally called on Valentini in his office in Curitiba.  They told him they wanted to get to know him.  Milititsky and Leone also told Valentini that he could purchase "more dynamic notes" with them than he could with Ghilardi.  They represented that the structured notes were "very good," "safe," that "many clients were buying them," and that there was "no risk of loss."  To sweeten the deal they offered to arrange for a loan to Valentini through Citibank, N.A. in the amount of $15 million that would be used for the purpose of buying structured notes.  Milititsky, however, added one condition. Valentini had to agree to transfer his account to Citigroup Private Bank so that it could be managed by Milititsky and Leone.  Neither Milititsky nor Leone were registered with or licensed by FINRA or the SEC to sell securities.

42.     Milititsky and Leone's offer to arrange for a $15 million loan interested Valentini because banks in Brazil rarely, if ever, made loans to individuals.  When a bank wanted to loan money to an individual it meant that the collateral, in this case the structured notes, had to be very safe.  Valentini interpreted Citibank's willingness to extend him a very large line of credit to mean that Citibank felt he was a "special" customer and had only his best interests at heart.

19

Indeed, the offer of a loan through Citibank was one of the most important reasons behind Valentini's decision to transfer his account to Citigroup Private Bank.

43.   Subsequent to their May 2007 meeting, Milititsky phoned Valentini on a weekly basis to convince him to transfer his account to Citigroup Private Bank.

44.   In or about mid-June 2007, Ghilardi phoned Valentini to inform him that the structured notes he had with CFSC were going to be successful.  He advised Valentini to buy four more notes with a purchase price of $5,607,500 per note for a total investment of $22,430,000.  To pay for the notes Ghilardi urged Valentini to reinvest the profits he had realized from the previous structured notes *plus* liquidate the balance of his entire portfolio.  Ghilardi once again represented to Valentini that the structured notes were "safe" investments.  Valentini relied on Ghilardi's representation as being truthful when made.

45.   Following Ghilardi's advice and recommendation Valentini purchased four more structured notes as follows:

    a.   Allegro Investment Corporation S.A., Luxembourg Equity Linked Securities (ELKS) Based Upon a Basket of Three Stocks (GOL-F-GM) due October 10, 2007.  The Underlying Basket consisted of shares of common stock or of American Depository Receipts ("ADR") of the following three companies:  GOL Linhas Aereas Intel-ADR ("GOL"), Ford Motor Company ("F"), General Motors Corp. ("GM");

    b.   Allegro Investment Corporation S.A., Luxembourg Equity Linked Securities (ELKS) Based Upon a Basket of Three Stocks (RIO-TAM-GGB) due October 10, 2007.  The Underlying Basket consisted of shares of common stock or of American Depository Receipts ("ADR") of the following three companies:  Companhia Vale do Rio Doce (CVRD) ("RIO"), TAM SA-ADR ("TAM"), Gerdau SA-ADR ("GGB");

    c.   Allegro Investment Corporation S.A., Luxembourg Equity Linked Securities (ELKS) Based Upon a Basket of Three Stocks (PBR-BBD-SID) due October 10, 2007.  The Underlying Basket consisted of shares of

common stock or of American Depository Receipts ("ADR") of the following three companies:  Petroleo Brasileiro S.A.-ADR ("PBR"), Banco Bradesco S.A.-ADR ("BBD"), Companhia Siderurgica Nacional S.A. (CSN) ("SID"); and

d.    Allegro Investment Corporation S.A., Luxembourg Equity Linked Securities (ELKS) Based Upon a Basket of Three Stocks (SNY-AMD-GM) due October 10, 2007.  The Underlying Basket consisted of shares of common stock or of American Depository Receipts ("ADR") of the following three companies:  Sanofi-Aventis-ADR ("SNY"), Advanced Mirco [sic] Devices ("AMD"), General Motors Corp. ("GM").

Neither Ghilardi nor CFSC delivered a prospectus or any other documentation to Valentini describing the product prior to his purchase.

46.    With respect to the ELKS described in paragraph 46(b) CFSC sold Valentini ***the entire issue***.  That meant that there was an especial dearth of liquidity.  It also meant that the prices that Ghilardi quoted Valentini between the purchase date and the sale date were questionable at best, as that price was not informed by any trading.  In a similar vein, Valentini bought 60% of the offerings described in paragraphs 21 and 22.

47.    Convinced by Milititsky of the benefits of moving to Citigroup Private Bank, in late June 2007 Valentini opened an account in Windsor's name.  Milititsky instructed Santander to fill out and sign the account opening documents.  Although Valentini's CFSC account located in Puerto Rico remained open the investments and administration of the account were transferred to Windsor's new account at Citigroup Private Bank.

48.    As Citigroup Private Bank processed Valentini's account transfer, on July 17, 2007 Valentini purchased four more structured notes in his CFSC account at the recommendation of Ghilardi.  Each structured note cost $5,607,500 for a total of $22,430,000.  When these structured notes matured in October 2007, the value and interest payments were

transferred to Windsor's account at Citigroup Private Bank and formed Windsor's initial capital contribution.

49.     In or about July 2007, Milititsky and Leone again traveled from Sao Paolo to Valentini's hometown of Curitiba, over 250 miles away. Milititsky presented Valentini with opportunities for more profitable investments. He told Valentini that Citigroup Private Bank had more autonomy, more power, and a larger selection of Citigroup structured products than CFSC. Milititsky also said that Citigroup Private Bank had "good experience" with the structured products sold by Citigroup and that these products would "be safer and more profitable." Milititsky "guaranteed a good administration of the investments" and promised Valentini "that you are going to make more money." Milititsky described the investments as "guaranteed" and told Valentini he would make 30-40% per year.

50.     Milititsky and Leone sent multiple emails to Valentini illustrating various Citigroup structured products. Each email contained only the most rudimentary information such as the interest rates and underlying stock(s). Citigroup Private Bank never delivered a prospectus or any other documentation to Windsor describing the products it pitched to Valentini.

51.     On or about July 17, 2007, a TAM aircraft slid off the runway in Sao Paulo at the Congonhas airport. Everyone aboard died and a building was destroyed. This event caused the value of TAM shares to fall dramatically along with the shares of other Brazilian airlines.

52.     At the time Valentini owned two structured notes that were linked to TAM and GOL (another Brazilian airline) stock. Following the plane crash the notes fell below the knock-in level. As a result Valentini automatically received the underlying TAM and GOL shares.

22

Milititski advised Valentini to sell the TAM and GOL shares in the market.  Valentini followed Milititski's advice and sold the TAM and GOL shares at a loss of approximately $1,660,000.

53.     Citibank made its first loan to Windsor in the amount of $15 million on or about July 23, 2007 evidenced by a Demand Note.  When a bank extends credit in excess of $100,000 secured directly or indirectly, in whole or in part, by any margin stock it must acquire from the borrower a completed Federal Reserve Form U-1, "Statement of Purpose for an Extension of Credit Secured by Margin Stock".  *See* 15 U.S.C. §§ 78g and 78w; 12 C.F.R. 221.  Despite a statement appearing at the bottom of the Form U-1 that "[t]his form should not be signed if blank," upon information and belief, on or about July 23, 2007 Milititski or another Citigroup Private Bank employee faxed a blank Form U-1 to Valentini for his signature beside a pre-marked "X".  Upon further information and belief Milititsky or another Citigroup Private Bank employee filled in the Form U-1 with the following ***intentionally fraudulent information***:

**Part I        To be completed by borrower(s)**

**1.  What is the amount of the credit being extended?**   USD 15,000,000.00

**2.  Will any part of this credit be used to purchase or carry margin stock? Yes     √ No**

**If the answer is "no," describe the specific purpose of the credit.**   WORKING CAPITAL AND LIQUIDITY NEEDS

54.     Milititsky or another Citigroup Private Bank employee completed the Form U-1 in handwritten English, a language Valentini did not speak or write.  Milititsky had told Valentini in no uncertain terms that any loans he acquired through Citibank had to be used to buy structured note products.  Valentini never borrowed nor intended to borrow any money from Citibank for "working capital and liquidity needs."  Milititsky or another Citigroup Private Bank

employee purposely lied on the Form U-1 to circumvent Regulation U which states that the maximum loan value of margin stock is 50 percent of its current market value.

55.     Not surprisingly, on July 25, 2007 Citigroup Private Bank sold Windsor three structured notes priced at $5,000,000 each for a total investment of $15,000,000.

56.     In or about the end of August 2007, Militstski phoned Valentini and told him that Citibank would consider making another loan to Windsor in the amount of $4 million to enable it to buy more structured notes.  Militstski advised that it was a good time to buy structured notes. On August 29, 2007 Citigroup Private Bank sold Windsor a structured note priced at $4,000,000. On August 30, 2007 Citibank made a second loan to Windsor in the amount of $4,000,000 evidenced by a Demand Note.

57.     On or about September 25, 2007, Militstski phoned Valentini to tell him that he was going to lose money on the two structured notes issued by Allegro that were linked to the shares of TAM and GOL.  Each note had a face value of $5,607,500.  Militstski told Valentini that Citibank would consider making two additional loans to Windsor for the express purpose of buying more structured notes to help Windsor recover from the Allegro losses.  Militstski promised Valentini that he would make sure that Windsor would not lose any more money on the failed Allegro structured notes.

58.     Citibank made a third loan to Windsor in the amount of $4 million on October 19, 2007 evidenced by a Demand Note.  During October 2007 Citigroup Private Bank sold Windsor three more structured notes for an aggregate price of $11,000,000.

24

59.     At the beginning of January 2008, Milititski again urged Valentini to borrow more money to buy more structured notes.  Citibank offered Valentini another $10 million in loans to do so.  Valentini told Milititski that he did not want to borrow more than $3 million.

60.     Citibank made a fourth loan to Windsor in the amount of $3 million on January 18, 2008 evidenced by a Demand Note.  Here too, upon information and belief, on or about December 19, 2007, Milititski or another Citigroup Private Bank employee faxed a blank Form U-1 to Valentini for his signature beside a pre-marked "X".  Upon further information and belief Milititsky or another Citigroup Private Bank employee then filled in the Form U-1 with the following *intentionally fraudulent information*:

**Part I        To be completed by borrower(s)**

**1.  What is the amount of the credit being extended?** ____USD 3,000,000.00

**2.  Will any part of this credit be used to purchase or carry margin stock? Yes     √ No**

**If the answer is "no," describe the specific purpose of the credit.**  WORKING CAPITAL AND LIQUIDITY NEEDS _____

61.     Milititsky or another Citigroup Private Bank employee completed the Form U-1 in handwritten English, a language Valentini did not speak or write.  Milititsky had told Valentini in no uncertain terms that any loans he acquired through Citibank had to be used to buy structured note products.  Valentini never borrowed nor intended to borrow any money from Citibank for "working capital and liquidity needs."  Milititsky or another Citigroup Private Bank employee purposely lied on the Form U-1 to circumvent Regulation U which states that the maximum loan value of margin stock is 50 percent of its current market value.

62.     During January 2008 Citigroup Private Bank sold Windsor three structured notes in the aggregate amount of $11,000,000.

63.     In or about February 2008, Militiski was replaced by Cesar Chicayban ("Chicayban") who took over administration of Windsor's account at Citigroup Private Bank.

64.     Beginning in March 2008 some of the shares underlying the structured notes Windsor owned began to decline in value.  On or about March 26, 2008, Citigroup Private Bank liquidated a portion of Windsor's investments to satisfy a $4 million margin call.  When Valentini asked Citigroup Private Bank for an alternate way to satisfy the margin call he was told that there was no other way than liquidation of the investments.  The question of who exactly bought the notes upon liquidation, how they were priced for sale or what otherwise happened to them is still unknown.

65.     Valentini's experience with bank loans came from the financing of construction projects in the normal course of his business.  Valentini did not understand the concept of "margin" or "margin calls".  Valentini had never had a brokerage account with margin, did not understand how trading on margin worked, nor did he understand the risks associated with trading on margin.  And no one CFSC or Citigroup Private Bank ever took the time to explain it to him.  By combining the risk inherent in using margin with the very high risk nature of the structured products sold to Windsor, CFSC and Citigroup Private Bank placed Windsor in an extremely volatile position, one which Valentini was unable to fully appreciate.

66.     In the beginning of April 2008, Valentini called Chicayban and asked him how he could, in effect, unwind Windsor's structured note investments so as to avoid future margin calls.  Valentini suggested that Windsor sell all of the structured notes at that time.  Chicayban told

26

Valentini that Windsor would lose money if it sold off the structured notes because they had to be sold back to the issuer(s) at a loss.  Prior to this conversation no one at CFSC or Citigroup Private Bank had ever explained to Valentini how to unwind a structured note he had purchased.

67.     Valentini also asked Chicayban about the effect of potential market instability on Windsor's investments.  Chicayban advised Valentini that it would be worse to unwind the structured notes now than to buy more notes and wait for the actions of the U.S. government to redirect the economy.  Chicayban lectured Valentini that Citigroup Private Bank knew more about the U.S. economy and that Valentini just had to trust him.  Citigroup Private Bank, however, turned Valentini's fear of loss into an opportunity to sell Windsor more structured notes as the market deteriorated.

68.     Chicayban assured Valentini that he would recommend alternate types of structured notes that would make money so Windsor could recover its losses.  Chicayban, however, recommended structured notes linked to shares in companies like Vale and Petrobras. These companies were nothing new to Valentini.  During the entire time that Valentini and Windsor maintained accounts with CFSC and Citigroup Private Bank neither was ever afforded the opportunity to choose from a wide array of structured note products.  The reason why, upon information and belief, is that Valentini's and then Windsor's account served as a "dumping ground" in an illiquid market for structured note products that other Citigroup investors were desperate to unload.

69.     Chicayban left Citigroup Private Bank sometime in mid-April 2008 and Roberto Martins ("Martins") took over the administration of Windsor's account through Citigroup Private Bank in Miami, Florida.  Valentini asked Martins how Windsor could unwind its structured note

27

investments.  Martins, like Chicayban, told Valentini that the only way out was for Windsor to sell the notes back to Citigroup at a loss or, in the alternative, buy more structured notes to try to recover Windsor's losses.

70.     In March 2008, Bear Stearns Corp., pushed to the brink of bankruptcy by what amounted to a run on the bank, agreed to sell itself to JP Morgan Chase for a mere $2 a share, narrowly averting a collapse that threatened to cascade through the financial system.  The price was later renegotiated to $8 but represented a startling 93 percent discount to Bear Stearns' closing stock price on Friday, March 24, 2008 on the New York Stock Exchange.  Bankers and policy makers raced to complete the deal before financial markets in Asia opened on Monday, as fears grew that the financial panic could spread if Bear Stearns failed to find a buyer.

71.     The deal, done at the behest of the Federal Reserve and the Treasury Department, punctuated the stunning downfall of one of Wall Street's biggest and most storied firms.  Bear Stearns weathered the vagaries of the markets for 85 years, surviving the Depression and a dozen recessions only to meet its end in the rapidly unfolding credit crisis now afflicting the American economy.

72.     Reflecting Bear Stearns's dire straits, JPMorgan agreed to pay just $236 million for the firm, a figure that included the price of Bear's soaring headquarters on Madison Avenue in Manhattan.  At $10 a share, JPMorgan bought Bear Stearns for a third of the price at which the troubled firm went public in 1985.  Only a year ago, Bear's shares fetched $170.  The cut-rate price reflected deep misgivings about the firm's prospects.

73.     In late April 2008, Valentini tried to contact Martins to get more information about Bear Stearns.  The fate of Bear Stearns' stock was of serious importance as Windsor held

three structured notes worth $9,000,000 linked to the performance of its stock.  Martins failed to respond to Valentini's repeated inquiries.

74.     Martins visited Valentini in Curitiba in mid-May 2008.  Valentini asked him to explain the margin calls that had occurred in Windsor's account.  Valentini demanded to know why Windsor was losing money when a string of Citigroup Private Bank employees had assured him that the notes were safe.  Martins blamed the financial crisis for the margin calls.  Valentini asked Martins to find a way to protect Windsor's investments.  Like his predecessors, Martins advised that Windsor should not sell the notes it currently owned because it would lose a substantial amount of money if it did.  Martins assured Valentini that he would help Windsor buy better notes that were "well thought out" and "guaranteed" so that Windsor would not suffer any further losses.

75.     Martins then handed Valentini an International Swap Dealers Association, Inc. ("ISDA") Master Agreement for Windsor, along with an ISDA Schedule, Security Agreement and Addendum to the Security Agreement.[4]  The document was dated April 30, 2008.  Valentini told Martins that he did not understand English and asked Martins to explain the contents of the document to him.  Instead, Martins told Valentini that the document was just a formality and that he should just sign it if Windsor wanted to continue to buy structured notes.  Martins said that there was nothing in the document that would alter their current relationship.  Martins told Valentini to just trust him on this.

---

[4] The ISDA Master Agreement is typically used between a derivatives dealer and their counterparty when discussions begin surrounding a derivatives trade.  The document is generally combined with a Schedule to set out the basic trading terms between the parties; each subsequent trade is then recorded in a Confirmation which references the Master Agreement and Schedule.  The terms of the Schedule are often negotiated, and many firms have preferred versions of the Schedule.

76.     Contrary to the terms of the trust agreement governing Windsor, Valentini signed the ISDA on behalf of Windsor.  Officials within Citibank apparently noticed the discrepancy and had the ISDA re-executed by Windsor's directors, Barcot and Densat.  Notwithstanding, CFSC and Citigroup Private Bank sold the vast majority of structured notes to Valentini and Windsor prior to the final execution of the ISDA Agreement on June 3, 2008.

77.     On May 20, 2008 Citibank prepared and presented for signature to Windsor a Demand Note in the principal amount of $18,000,000.  During May 2008 Citigroup Private Bank sold Windsor two structured notes with an aggregate purchase price of $5,000,000.

78.     On or about June 19, 2008, Valentini sent a letter to Citigroup Private Bank in Brazil expressing concern over the Bear Stearns debacle.  He made sure to deliver the letter at the Citigroup Private Bank branch in Brazil so that an employee could stamp the letter to verify its receipt.

79.     On or about June 20, 2008, Valentini sent two more letters to Martins asking for information about JPMorgan's fire sale purchase of Bear Stearns.  Again, Valentini took these letters to the Citigroup Private Bank branch in Brazil so that an employee could stamp the letters to verify their receipt.

80.     On or about June 20, 2008 Valentini also sent a fax to Martins requesting copies of the documentation relating to the March 26, 2008 liquidation of Windsor's investments.  Eventually, on or about July 28, 2008, Citigroup Private Bank in Brazil advised Valentini to have a legal representative of Windsor contact Citibank in New York for assistance.

81.     From on or about July 3, 2008 to August 20, 2008, Windsor began to pay down the outstanding principal on its Citibank loans to reduce its exposure.  Valentini began to doubt

the structured products sold to Windsor by Citigroup Private Bank as well as the integrity of the representations made to him by its private bankers. In July 2008, Windsor repaid Citibank $7 million. In August 2008, Windsor repaid Citibank $2 million.

82.     On or about July 9, 2008, Martins and his boss, Alex Lago ("Lago"), called Valentini to persuade him to buy more structured notes. Despite his misgivings, Citigroup Private Bank had convinced Valentini that this was the only way to recover his Windsor's losses. Valentini asked for "safe" notes. In response both Martins and Lago advised Valentini to buy notes linked to one stock on the theory that there was less risk. In fact, buying notes linked to just one stock was even riskier and Martins and Lago knew it. Based on Martins' and Lago's joint recommendation, on July 10, 2008 Windsor purchased its last three structured notes from Citigroup Private Bank for an aggregate purchase price of $4,000,000.

83.     In or about August 2008, a former Citigroup Private Bank employee by the first name of Adriano visited Valentini in Curitiba. Adriano had worked with Chicayban in Miami and now worked for Santander. Adriano told Valentini, much to his shock and surprise, that Citigroup Private Bank's liquidation of Windsor's investments had generated a 1% commission to Citigroup Private Bank, *i.e.* approximately $40,000. Adriano said that he had told Chicayban that charging the commission was wrong.

84.     In or about early August 2008, Martins phoned Valentini to recommend that Windsor buy more structured notes because "they knew more about the market than Valentini." At this point Windsor owed Citibank $11,000,000. Martins told Valentini that he still had $2,000,000 left with which to buy more structured notes. Valentini told Martins that he would prefer to use the $2,000,000 to pay down the loan to $9,000,000.

31

85.     Citibank prepared and presented to Windsor for signature a Demand Note in the principal amount of $9,000,000 dated August 20, 2008.  Once again, upon information and belief, on or about August 20, 2008, Martins or another Citigroup Private Bank employee faxed a blank Form U-1 to Valentini for his signature beside a pre-marked "X".  Upon further information and belief Martins or another Citigroup Private Bank employee then filled in the Form U-1 with the following ***intentionally fraudulent information***:

**Part I        To be completed by borrower(s)**

**1.  What is the amount of the credit being extended?     USD 9,000,000.00**

**2.  Will any part of this credit be used to purchase or carry margin stock? Yes     √ No**

**If the answer is "no," describe the specific purpose of the credit.  LEVERAGE**

86.     On September 15, 2008, as the stock market crisis worsened, Valentini sent an email to Renato Machado de Almeida ("Almeida"), Managing Director at Citigroup Private Bank, and Martins telling them that, if necessary, he would reallocate resources to avoid any further margin calls.  From September 15, 2008 forward Valentini maintained daily contact with Martins to monitor Windsor's account.

87.     As of September 18, 2008 Windsor had a portfolio of investments in structured note products with a face value of $32,000,000 and a Citibank loan balance of $9,000,000.  Much to his surprise and great distress Valentini learned via a conference call from Almeida and Martins that on September 18, 2008 Citigroup Private Bank had liquidated Windsor's entire portfolio to satisfy its $9,000,000 loan.

88.     Investors like Valentini and Windsor who held these so-called "income investments" in 2008 were indeed shocked to learn what they really owned when the stock

market crashed.  This information (if it were disclosed) would have caused most investors to say "no thanks" to reverse convertibles, and to think about moving their account to a broker who could be trusted to provide appropriate investment advice.

## AS AND FOR A FIRST CLAIM FOR RELIEF
### (Violation of Rule 10b-5, Securities Exchange Act of 1934)

89.     Plaintiffs repeat and reallege each and every allegation above with the same force and effect as though more fully set forth herein again at length.

90.     The instruments purchased for Plaintiffs' accounts identified above were "securities" within the meaning of the § 3(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(c)(10), and thus the purchase for Plaintiffs' account of those instruments constituted a purchase or sale of "securities" subject to the provisions of the Securities Exchange Act of 1934.

91.     In purchasing the aforesaid instruments for Plaintiffs' accounts, Defendants had a duty to disclose but failed to disclose the true facts concerning the securities that were purchased for Plaintiffs' accounts and thus made statements that were untrue or that omitted material facts necessary in order to make the statements, in light of the circumstances, not misleading. Defendants engaged in a practice and course of conduct of disregarding Plaintiffs' investment objectives, putting all of Plaintiffs' funds into high risk instruments, taking actions purportedly on behalf of Plaintiffs without Plaintiffs' knowledge, consent, instruction or authorization, acting without authority and in derogation of their obligations to Plaintiffs and breaching their obligations of good faith and fair dealing.  Plaintiffs reasonably relied upon the misrepresentations and omissions of material facts Defendants made with respect to Plaintiffs'

accounts and as to the specific securities discussed with Plaintiffs for purchase, and the subject

transactions would not have occurred but for Defendants' representations and omissions to state.

92.     By reason of the foregoing, Defendants violated Rule 10b-5 promulgated under §

10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b).

93.     Plaintiffs were not aware of any facts constituting the violations of Section 10(b)

and Rule l0b-5 alleged herein *i.e*., that the securities were not "safe" or "principal protected" but

essentially high risk, unsecured loans to issuers loaded with toxic assets worth far less than the

value at which they were carried until, at the very earliest, July 2010, when Plaintiffs' consulted

an expert in structured note products.  Plaintiffs commenced this suit within one year of the date

they became aware of the facts constituting the violations alleged herein and within three years

of the date Plaintiffs purchased the securities.  As a result, the claims alleged in this Count were

brought within the applicable statute of limitations.

94.     By reason of the foregoing, Plaintiffs are entitled to damages in an amount to be

determined at trial but not less than $25,000,000, together with interest, as provided by law, and

costs, including reasonable attorneys' fees and $10,000,000 in punitive damages.

### AS AND FOR A SECOND CLAIM FOR RELIEF
#### (Violation of § 215 of Investment Advisors Act of 1940)

95.     Plaintiffs repeat and reallege each and every allegation above with the same force

and effect as though more fully set forth herein again at length.

96.     The instruments purchased for Plaintiffs' accounts identified above were

"securities" within the meaning of the § 3(10) of the Securities Exchange Act of 1934, 15 U.S.C.

78(c)(10), and the purchase for Plaintiffs' accounts of those securities constituted a purchase or

sale of securities subject to the provisions of the Securities Exchange Act of 1934, 15 U.S.C. §

78a *et seq*. and subject to the provisions of the Investment Advisors Act of 1940.

97.    To induce Plaintiffs to open an account and to entrust their hard earned funds with

Defendants, Defendants held themselves out to Plaintiffs and the general public as an institution

which was familiar with, and experienced in, the buying and selling of securities, and other

similar transactions related thereto, such as the ones instructed by Plaintiffs, *i.e.* conservative

investment instruments that would protect the funds deposited, and that they would not only act

in good faith, but would exercise reasonable diligence and the care and skill ordinarily possessed

by institutions or persons engaged in the same business in this State.  In furtherance of the

inducement, Defendants engaged a FINRA registered representative employed by CFSC, and

several private bankers employed by Citigroup Private Bank, to speak and convince Plaintiffs to

open accounts with Defendants.

98.    However, and as set forth hereinabove, Defendants engaged in a course of

investing, in violation of the Investment Advisors Act of 1940, Plaintiffs' funds without

Plaintiffs' knowledge, consent, instructions or authorization in very risky, unsuitable and

unsolicited instruments, all the while charging commissions, margin interest and other account

fees in the thousands of dollars at a time.

99.    At all relevant times, by reason of maintaining Plaintiffs' accounts, Defendants

were under a duty to act in accordance with the provisions of the Investment Advisors Act of

1940 and specifically of § 206 of the Investment Advisors Act of 1940, 15 U.S.C. § 80b-6, and

the regulations promulgated under the Investment Advisors Act of 1940, which Defendants

failed to do by, among other things:  failing to disclose the true facts concerning the instruments

that were purchased for Plaintiffs' accounts; making statements that were untrue or that omitted material facts necessary in order to make the statements, in the light of the circumstances, not misleading; engaging in a practice and course of conduct of disregarding Plaintiffs' conservative profile; putting all of Plaintiffs' funds into high risk instruments, taking actions purportedly on behalf of Plaintiffs without Plaintiffs' knowledge, consent, instruction or authorization; acting without authority and in derogation of their obligations to Plaintiffs; breaching their obligations of good faith and fair dealing; failing to exercise reasonable diligence and the care and skill ordinarily possessed by institutions or persons engaged in the same business in this State; failing to properly supervise and use reasonable and prudent care in the management of said accounts; failing to safeguard the assets held therein; failing to honor Plaintiffs' instructions, in the account opening documents; and failing otherwise to refrain from taking any action with respect to the Plaintiffs' funds, in the absence of specific instructions and authorization from Plaintiffs. Plaintiffs reasonably relied upon the misrepresentations and omissions of material facts Defendants made with respect to Plaintiffs' accounts and as to the specific securities discussed with Plaintiffs for purchase, and the subject transactions would not have occurred but for Defendants' representations and omissions to state.

100.     By reason of the foregoing, Defendants failed to manage or handle Plaintiffs' accounts in compliance with Investment Advisors Act of 1940, in violation of §215 of the Investment Advisors Act of 1940, 15 U.S.C. § 80b-15 and Plaintiffs are entitled to rescission of all monies paid to Defendants, with interest.

101.     By reason of the foregoing, Plaintiffs are entitled to rescission in an amount to be determined at trial, together with interest, as provided by law, and costs.

## AS AND FOR A THIRD CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

102.    Plaintiffs repeat and reallege each and every allegation above with the same force and effect as though more fully set forth herein again at length.

103.    Defendants owed Plaintiffs the fiduciary duties of fidelity, trust, loyalty, honesty and due care and were required to deal with and carry out their duties and responsibilities in a fair, just and equitable manner and to work in the best interest of the Plaintiffs so as to benefit them, and not in furtherance of their personal interests or at the expense of or in derogation of the best interests of the Plaintiffs.

104.    Defendants, singly and in concert, engaged in the conduct described herein in breach of their fiduciary duties to Plaintiffs.

105.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been materially and substantially damaged.

106.    By reason of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial but not less than $25,000,000, together with interest, as provided by law, and costs, including reasonable attorneys' fees, and $10,000,000 in punitive damages.

## AS AND FOR A FOURTH CLAIM FOR RELIEF
### (Negligence)

107.    Plaintiffs repeat and reallege each and every allegation above with the same force and effect as though more fully set forth herein again at length.

108.    Defendants owed a duty to Plaintiffs to use ordinary care to prevent Plaintiffs from being foreseeably injured as a result of their conduct.  Defendants breached the duty

through their conduct as set forth above, and Plaintiffs were directly and foreseeably injured as a result of the breach.

109.    By reason of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial, but not less than $25,000,000, together with interest, as provided by law, and costs and $10,000,000 in punitive damages.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

110.    Plaintiffs repeat and reallege each and every allegation above with the same force and effect as though more fully set forth herein again at length.

111.    In making the misrepresentations and omissions alleged above, Defendants acted without any reasonable grounds for believing the representations they made to be true.

112.    Plaintiffs were ignorant of the falsity of these statements, and believed them to be true.  In actual and justifiable reliance upon said omissions and misrepresentations of material fact, Plaintiffs were induced to and did invest in securities sold to them by Defendants.  Had Plaintiffs known the true facts, they would have taken no such action.

113.    By reason of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial, but not less than $25,000,000, together with interest, as provided by law, and costs and $10,000,000 in punitive damages.

## AS AND FOR A SIXTH CLAIM FOR RELIEF
### (Negligent Supervision)

114.    Plaintiffs repeat and reallege each and every allegation above with the same force and effect as though more fully set forth herein again at length.

38

115.    To induce Plaintiffs to open an account and to entrust their hard earned funds with Defendants, Defendants held themselves out to Plaintiffs and the general public as an institution which was familiar with, and experienced in, the buying and selling of securities, and other similar transactions related thereto, such as the ones instructed by Plaintiffs, *i.e.* conservative investment instruments that would protect the funds deposited, and that they would not only act in good faith, but would exercise reasonable diligence and the care and skill ordinarily possessed by institutions or persons engaged in the same business in this State.  In furtherance of the inducement, Defendants engaged a FINRA registered representative employed by CFSC, and several private bankers employed by Citigroup Private Bank, to speak and convince Plaintiffs to open accounts with Defendants.

116.    However, and as set forth hereinabove, Defendants engaged in a pattern of investing Plaintiffs' funds without Plaintiffs' knowledge, consent, instructions or authorization in very risky, unsuitable and unsolicited instruments, all the while charging commissions, margin interest and other account fees in the thousands of dollars at a time.

117.    At all relevant times, by reason of maintaining Plaintiffs' accounts, Defendants were under a duty to act in good faith, to exercise reasonable diligence and the care and skill ordinarily possessed by institutions or persons engaged in the same business in this State, to properly supervise and use reasonable and prudent care in the management of said accounts, to safeguard the assets held therein, to honor Plaintiffs' instructions, in the account opening documents, and to otherwise refrain from taking any action with respect to the Plaintiffs' funds, in the absence of specific instructions and authorization from Plaintiffs.

118.    Defendants negligently failed to properly supervise and use reasonable and prudent care in the management of Plaintiffs' accounts, and to safeguard the assets held therein, by making several investments with Plaintiffs' funds, without the knowledge, consent, instruction and authorization of Plaintiffs.

119.    In so doing, Defendants failed to manage or handle Plaintiffs' accounts in a skillful, prudent, reasonable and professionally expert manner and failed to act in accordance with reasonably prudent standards of conduct prevailing among and known to experienced and expert financial institutions trading in securities, as a result of which Plaintiffs have been denied the opportunity and ability to preserve their funds for the future financial well being of the Valentini family.

120.    By reason of the foregoing, Plaintiffs have suffered damages, which were caused solely by the negligence of Defendants.

121.    By reason of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial, but not less than $25,000,000, together with interest, as provided by law, and costs and $10,000,000 in punitive damages.

## AS AND FOR A SEVENTH CLAIM FOR RELIEF
### (Conversion)

122.    Plaintiffs repeat and reallege each and every allegation above with the same force and effect as though more fully set forth herein again at length.

123.    Notwithstanding Plaintiffs' requirement that Defendants keep their investments in conservative vehicles, Defendants failed to do so and failed to repay the funds it lost on

Plaintiffs' account due to Defendants' breach of fiduciary duties and care, thereby taking

unlawful possession and converting Plaintiffs' monies.

124.    By reason of the foregoing, Plaintiffs are entitled to damages in an amount to be

determined at trial but not less than $25,000,000 in compensatory damages and $10,000,000 in

punitive damages, together with interest, as provided by law, and costs.

**AS AND FOR AN EIGHTH CLAIM FOR RELIEF**
**(Common Law Fraud)**

125.    Plaintiffs repeat and reallege each and every allegation above with the same force

and effect as though more fully set forth herein again at length.

126.    For the purpose of inducing Plaintiffs to purchase securities from Citigroup, and

with the intent to deceive Plaintiffs, Defendants employed a scheme to defraud as a part of which

the Defendants made and participated in the making of material misrepresentations of fact and

the omission of material facts.

127.    Plaintiffs were ignorant of the material misrepresentation and omissions described

herein.  In justifiable reliance on the misrepresentations and in ignorance of the true facts,

Plaintiffs were induced to and did purchase the securities.  Had Plaintiffs known the true facts,

they would have taken no such action.

128.    By reason of the foregoing, Plaintiffs are entitled to damages against Defendants

in an amount to be determined at trial but not less than $25,000,000, together with interest, as

provided by law, and costs, including reasonable attorneys' fees and $10,000,000 in punitive

damages.

## AS AND FOR A NINTH CLAIM FOR RELIEF
### (Breach of Contract)

129.    Plaintiffs repeat and reallege each and every allegation above with the same force and effect as though more fully set forth herein again at length.

130.    Defendants entered into a professional service arrangement with Plaintiffs to develop and manage their investment portfolio, and to advise them concerning investments suitable in light of their investment objectives.  Defendants were obligated by contract to abide by all applicable FINRA, state and federal regulations.

131.    In undertaking its contractual performance, Defendants represented to Plaintiffs that they were skilled and experienced as a financial advisory firm and would provide advice in connection with Plaintiffs' investments.

132.    Plaintiffs paid Defendants the fees charged in accordance with the arrangement.

133.    Defendants were required to perform under the arrangement in good faith and in accordance with professional standards and applicable regulations.

134.    Defendants breached the professional service arrangement by virtue of the conduct and omissions alleged herein.

135.    Plaintiffs were injured by Defendants' breach of contract.

136.    By reason of the foregoing, Plaintiffs are entitled to damages against Defendants in an amount to be determined at trial but not less than $25,000,000, together with interest, as provided by law, and costs, including reasonable attorneys' fees and $10,000,000 in punitive damages.

## AS AND FOR A TENTH CLAIM FOR RELIEF
### (Unjust Enrichment)

137.    Plaintiffs repeat and reallege each and every allegation above with the same force and effect as though more fully set forth herein again at length.

138.    The charge of excessive commissions and margin interest as alleged herein unjustly enriched Defendants.  In the circumstances presented herein, in equity and justice, Defendants should not be permitted to retain this unjust enrichment, and the Court should order its disgorgement

139.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs have been damaged and should be compensated from the sums disgorged from Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered against Defendants, jointly and severally:

i.      With respect to the FIRST CLAIM FOR RELIEF, by awarding Plaintiffs damages in an amount to be determined at trial but not less than $25,000,000 in compensatory damages, including consequential and incidental damages, and $10,000,000 in punitive damages, together with interest, as provided by law, and costs, including attorneys' fees;

ii.     With respect to the SECOND CLAIM FOR RELIEF, by awarding Plaintiffs rescission of all monies paid by Plaintiffs to Defendants, with interest, as provided by law, and costs;

iii.   With respect to the THIRD CLAIM FOR RELIEF, by awarding Plaintiffs damages in an amount to be determined at trial but not less than $25,000,000 in compensatory damages, including consequential and incidental damages, and $10,000,000 in punitive damages, together with interest, as provided by law, and costs, including attorneys' fees;

iv.   With respect to the FOURTH CLAIM FOR RELIEF, by awarding Plaintiffs damages in an amount to be determined at trial but not less than $25,000,000 in compensatory damages, including consequential and incidental damages, and $10,000,000 in punitive damages, together with interest, as provided by law, and costs, including attorneys' fees;

v.   With respect to the FIFTH CLAIM FOR RELIEF, by awarding Plaintiffs damages in an amount to be determined at trial but not less than $25,000,000 in compensatory damages, including consequential and incidental damages, and $10,000,000 in punitive damages, together with interest, as provided by law, and costs, including attorneys' fees;

vi.   With respect to the SIXTH CLAIM FOR RELIEF, by awarding Plaintiffs damages in an amount to be determined at trial but not less than $25,000,000 in compensatory damages, including consequential and incidental damages, and $10,000,000 in punitive damages, together with interest, as provided by law, and costs, including attorneys' fees;

vii.   With respect to the SEVENTH CLAIM FOR RELIEF, by awarding Plaintiffs damages in an amount to be determined at trial but not less than $25,000,000 in

compensatory damages, including consequential and incidental damages, and $10,000,000 in punitive damages, together with interest, as provided by law, and costs, including attorneys' fees;

viii. With respect to the EIGHTH CLAIM FOR RELIEF, by awarding Plaintiffs damages in an amount to be determined at trial but not less than $25,000,000 in compensatory damages, including consequential and incidental damages, and $10,000,000 in punitive damages, together with interest, as provided by law, and costs, including attorneys' fees;

ix. With respect to the NINTH CLAIM FOR RELIEF, by awarding Plaintiffs damages in an amount to be determined at trial but not less than $25,000,000 in compensatory damages, including consequential and incidental damages, and $10,000,000 in punitive damages, together with interest, as provided by law, and costs, including attorneys' fees;

x. With respect to the TENTH CLAIM FOR RELIEF, disgorging Defendants' unjust enrichment, including the excessive commissions and margin interest charged to Plaintiffs; and

xi. awarding Plaintiffs their attorneys fees, expert fees, disbursements and costs and such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAMDED

Plaintiffs hereby demand a trial by jury.

Dated: New York, New York
February 28, 2011

LOUIS F. BURKE, P.C.

By: /s/Leslie Wybiral
      Leslie Wybiral, Esq.
Louis F. Burke, Esq.
Elspeth L. Gibb, Esq.
Amanda N. Miller, Esq.
460 Park Avenue, 21ST Floor
New York, NY 10022
Tel:  (212) 682-1700
Fax:  (212) 808-4280
lburke@lfblaw.com
lwybiral@lfblaw.com
egibb@lfblaw.com
amiller@lfblaw.com

*Pro Hac Vice Admission Pending*
Quinn Smith, Esq.
Smith International Legal
Consultants, P.A.
175 SW 7th St., Suite 2003
Miami, FL 33130
Tel:  (305) 856-7723
Fax:  (786) 220-8361
quinn.smith@smintlaw.com