UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BERNARDO VALENTINI and WINDSOR
INTERNATIONAL CO., f/k/a WINDSOR
INTERNATIONAL INVESTMENT CORP.,

                    Plaintiffs,

         v.

CITIGROUP, INC., CITIGROUP GLOBAL
MARKETS INC., CITICORP FINANCIAL
SERVICES CORPORATION, n/k/a CITI
INTERNATIONAL FINANCIAL SERVICES,
LLC, CITIBANK, N.A., and CITI PRIVATE
BANK

                    Defendants.

11 Civ. 1355 (LBS)

<u>MEMORANDUM</u>
<u>& ORDER</u>

---

SAND, J.

       Defendants Citigroup, Inc. ("Citigroup"), Citigroup Global Markets Inc. ("CGMI"),

Citicorp Financial Services Corporation ("CFSC"), now known as Citi International Financial

Services, LLC, Citibank, N.A. ("Citibank"), and Citi Private Bank ("CPB") (collectively

"Defendants") move the Court to dismiss the complaint filed by Bernardo Valentini

("Valentini") and Windsor International Co. ("Windsor"), formerly known as Windsor

International Investment Corp. For the reasons provided below, Defendants' motion is granted in

part and denied in part.

## I. Background[1]

       Valentini is a Brazilian businessman. Compl. ¶1. Windsor is the trust he established in

early 2007 to manage his family investments. *Id.* ¶¶ 2, 40. Between September 2006 and

September 2008, Valentini, in his own name or on behalf of Windsor, purchased almost two

---

[1] The following facts are based on Plaintiffs' allegations in the Complaint ("Compl."), filed February 28, 2011.

dozen structured notes from CFSC and CPB for a face value of over $130,000,000. *Id.* ¶¶ 36–39, 44, 48, 56, 58, 62, 82. Most, if not all, of these notes, were ELKS. ELKS is a Citibank trademarked acronym that stands for "equity linked securities." Pls.' Mem. Opp. Defs.' Mot. Dismiss, at 10 n.8. Equity linked securities—or what are more generically referred to as "equity linked notes" ("ELNS")—are complex debt instruments that differ from standard securities in that their value upon maturity is tied to the value of a third-party equity, such as a stock, a basket of stocks or an equity index. *See* http://en.wikipedia.org/wiki/Equity-Linked_Note. In this case, all of the ELKS that Plaintiffs purchased were linked to the value of the American Depository Receipts ("ADRs")[2] or common stock of U.S. or Brazilian companies traded on the New York Stock Exchange ("NYSE"). Compl. ¶¶ 36, 38–39, 45.

ELNS are typically considered conservative investments. They offer limited returns but typically provide "principal protection" in the form of a 100% guarantee of repayment upon the note's maturation. Wybiral Decl. Ex. D, at 2. At least some of the ELKS Plaintiffs purchased contained additional features, however, that made them riskier than ordinary ELNS. For example, some of the notes contained a "knock-in" provision, generally associated with Reverse Convertible Notes ("RCNs") rather than ELNS. This provision mandated that, if the value of the assets to which the note was linked fell below a certain percentage of their initial value, a "knock-in" would take place, meaning that the note would convert into a specified number of shares of the lowest valued asset linked to the note, which the investor would then own. Compl. ¶¶ 15–16.

---

[2] An ADR is a physical certificate of ownership in a specified number of a company's ordinary shares. ADRs are typically used to represent ownership in the stock of foreign companies that trade on the U.S. stock exchanges. Because they are tradable like any other registered American security, they allow U.S. investors to trade in foreign companies without having to purchase foreign stock. *See Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 367 (3d Cir. 2002). However, an "ADR holder can generally exchange his or her ADRs for the underlying shares at any time." *In re Vivendi Universal, S.A. Sec. Litig.,* 765 F. Supp. 2d 512, 521 (S.D.N.Y. 2011).

Valentini alleges that he first learned about the notes in September 2006 when his friend and CFSC stockbroker, Roberto Ghilardi, recommended the notes to him as a more lucrative alternative to the government bonds and Brazilian state-owned companies in which Valentini was at the time invested. *Id.* ¶¶ 31–32. Initially Valentini profited from his investments in the notes. *Id.* ¶ 37. However in mid July, 2007 he suffered his first loss when a TAM aircraft slid off the runway in Sao Paulo, killing everyone on board. The value of TAM and other Brazilian airline stock fell dramatically as a result, causing the value of two of the ELKS that Valentini owned to fall below their knock-in level. *Id.* ¶¶ 51–52. As a result the notes converted into stock in the two airline companies, which Valentini sold, at a loss of $1,660,000. *Id.* ¶ 52.

The losses kept coming. In late June 2007 Valentini opened an account in Windsor's name with CPB and moved the contents of his CFTC account to this new account. *Id.* ¶ 47. Over the next few months Citibank loaned Windsor $26 million, which the trust used to purchase additional notes and for which the notes served as collateral. *Id.* ¶¶ 53, 55–56, 58, 60. On March 26, 2008 CPB liquidated a portion of Windsor's structured note investments when the declining value of the notes—brought on by the worldwide financial crisis—triggered a $4 million margin call on its loans. *Id.* ¶ 64. As the global financial crisis deepened, the value of the ELKS only continued to decline. Nonetheless the trust continued to purchase additional notes, in the hopes of making up its previous losses. *Id.* ¶¶ 77, 82. It also began to pay down the outstanding principal on its loans. Between July and August, 2008, Windsor repaid $9 million of the money it owed the bank, leaving it with $9 million in debt. *Id.* ¶¶ 81, 84. This was insufficient, however, to prevent further loss. On September 18, 2008, in response to continued declines in the value of the trust's investments, Citibank liquidated Windsor's entire investment portfolio of notes (face value, $32,000,000) to satisfy its $9 million of debt. *Id.* ¶ 87.

On February 28, 2011, Plaintiffs filed suit, accusing Defendants of violating § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), as implemented by SEC Rule 10b-5, and § 215 of the Investment Advisors Act of 1940, 15 U.S.C. § 80b-1 *et seq*. They also accused Defendants of breach of fiduciary duty, negligence, negligent misrepresentation, negligent supervision, conversion, common law fraud, breach of contract, and unjust enrichment. In response Defendants filed the motion that is the subject of this order.

## II. The Standard of Review

On a motion to dismiss, a court reviewing a complaint will consider all material factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Lee v. Bankers Trust Co.*, 166 F.3d 540, 543 (2d Cir. 1999). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through 'factual allegations sufficient to raise a right to relief above the speculative level.'" *ATSI Commc'ns Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87, 93 (2d Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 ( 2009). Rather, the plaintiff's complaint must include "enough facts to state a claim to relief that is plausible on its face." *Iqbal*, 129 S. Ct. at 1940 (citing *Twombly*, 550 U.S. at 570).

Allegations of fraud must meet the heightened pleading standard of Rule 9(b), which requires that the plaintiff "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). "[W]hile Rule 9(b) permits scienter to be demonstrated by inference, this

4

must not be mistaken for license to base claims of fraud on speculation and conclusory allegations. An ample factual basis must be supplied to support the charges." *O'Brien v. Nat'l Prop. Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991) (internal citations omitted).

In reviewing a complaint, a court is not limited to the four corners of the complaint; a court may also consider "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

## III. Discussion

### A. The § 10(b) Claim

To state a claim for misrepresentation under § 10(b) of the Securities Exchange Act of 1934, a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury. *ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007).

Defendants argue that the claim must be dismissed because Plaintiffs have failed to satisfactorily allege: (1) that any of their misrepresentations or omissions were material; (2) that Defendants acted with scienter; (3) that Plaintiffs acted reasonably in relying on Defendants' misrepresentations; or (4) the loss causation necessary to establish proximate cause under §10(b).[3] Defendants also argue that the claim should be dismissed because it is time-barred and

---

[3] *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) ("It is long settled that a securities-fraud plaintiff must prove both transaction and loss causation....Transaction causation is akin to reliance, and requires only an allegation that but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction....Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.") (internal quotes omitted).

because it exceeds the territorial reach of the statute, as recently construed by the Supreme Court in *Morrison v. National Australian Bank Ltd.*, 130 S. Ct. 2869 (2010). We find none of these arguments sufficient to warrant dismissing the §10(b) claim in its entirety.

### 1. Materiality

Plaintiffs allege that Defendants violated §10(b) when they intentionally misrepresented, through both affirmative misstatement and omission, the risks associated with the structured notes. As evidence of Defendants' affirmative misstatements, they cite a variety of oral statements that CFSC and CPB employees made to Valentini that indicated that the notes were "safe" investments and "carried no risk of loss" because "they had a barrier of protection." Compl. ¶ 32, 41. As evidence of Defendants' wrongful omissions, Plaintiffs point to Defendants' failure to disclose to them detailed information about how the structured notes were in fact structured, such as their payout arrangement and fee structure, *id.* ¶¶ 33-34, 36, 38, 39, and to properly inform them about the risks associated with margin trading. *Id.* ¶ 65. They also allege that on multiple occasions, the only information they received about the notes was an email containing "rudimentary information such as the interest rate and underlying stock(s)," and that neither CFSC nor CPB provided them with a prospectus or any other documentation describing the notes prior to their purchase. *Id.* ¶¶ 36, 38, 39, 45, 50.

Defendants argue that none of these misstatements or omissions satisfy the test for materiality set forth by the Supreme Court in *Basic v. Levinson*, 485 U.S. 224, 231–32 (1988) (holding that an omitted fact is material only if there is a "substantial likelihood" that its disclosure "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available") (internal quotes omitted). The alleged misrepresentations were too few to have significantly altered the total mix of information

6

available to Plaintiffs, Defendants argue, given what they claim to be the "extensive" warnings and disclaimers provided Plaintiffs prior to their purchase of the notes. Defs.' Rep. Mem. Further Supp. Defs.' Mot. Dismiss, at 2.

We disagree. It is true that, under what is frequently called the "bespeaks caution" doctrine, forward-looking statements that directly contradict cautionary language in the offering documents will generally be considered immaterial as a matter of law. *See, e.g., Iowa Pub. Employees' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010); *Halperin v. Ebanker Usa.com*, 295 F.3d 352, 357 (2d Cir. 2002). However, this is the case only when the cautionary language "directly relates to" the risk that was allegedly misrepresented. *Halperin,* 295 F.3d at 359.

In this case, Defendants direct us to the warnings and disclaimers in two sets of documents: first, the Initial Purchaser Representations that Valentini signed each time he purchased a structured note from CFSC; second, the Structured Notes Master Agreement, signed on July 20, 2007, that governed Windsor's purchases of notes from CPB. Slipp Decl. Ex. B, A. Neither document contains cautionary language that "directly relates to" all of the risks Plaintiffs claim were misrepresented.

The Initial Purchaser Representations contain no cautionary language whatsoever.  In contrast, the Structured Notes Master Agreement does contain a number of warnings about the risks associated with the structured notes. Most importantly, the Agreement warns, in its opening paragraph (and in bold type) that "[m]any Structured Notes do not provide any principal protection, and if you invest in this type of product, you could lose the entire principal amount of your investment in these products." Slipp Decl. Ex. A at 1. It also includes a representation in which the client agrees that "he/she/it will determine at the time of the purchase… that he/she/it

7

can bear the economic risks of such investment, including the possible loss of all of his/her/its

investment." *Id.* ¶ 10. Insofar as these warnings "directly relate to" the risk that an investor could

lose all of the money he or she invested in the notes, they appear, under the "bespeaks caution

doctrine," to render misrepresentations regarding the principal-protected nature of the notes

immaterial as a matter of law.

These warnings do not, however, directly relate to the other risks that Plaintiffs claim

were misrepresented through omission, if not through affirmative misstatement, such as the risk

that the note could convert into shares of stock or ADRs.[4]  In addition, although the Agreement

provides a generally worded warning about the risks associated with margin trading—and

specifically, alerts investors to the possibility that "adverse market conditions" might lead

Citibank to require investors to "provide additional payments" or result in the liquidation of their

investments "with little or no notice"—it provides no specific information about the conditions

under which this liquidation would occur. Slipp Decl. Ex. A at 5.[5]  What constitutes an "adverse

market condition"? How large might the additional payments be? The warning about the risk of

liquidation is therefore critically incomplete. *See Credit Suisse First Boston Corp. v. Arm Fin.*

*Group*, No. 99 Civ. 12046, 2001 U.S. Dist. LEXIS 3332, at *23-24 (S.D.N.Y. Mar. 27, 2001)

---

[4] Although ordinarily silence, absent a duty to disclose, is not actionable under §10(b), *Chiarella v. United States*, 445 U.S. 222, 230 (1980), a duty to disclose can arise "when disclosure is necessary to make prior statements not misleading." *In re Time Warner Sec. Litig.* 9 F.3d 259, 268 (2d Cir. 1993). In this case, we find that Plaintiffs have plausibly established that Defendants' repeated assurances that the notes were "safe" and risk-free investments imposed on them a duty to disclose to Plaintiffs full information about the relevant risks, in order to make these assurances not misleading.

[5] The full paragraph reads:
> "Leverage. Leverage allows clients to achieve much higher potential returns, but considerably increases the risk of losing capital. Due to adverse market movements, Citibank may at any time require the client to provide additional payments, which may be significant in size. If the client obtains leverage for the investment, the client should make sure they have sufficient liquid assets to meet the margin requirements in the event of market movements adverse to the client's position. In such case, if the client does not make the margin payments then the client's investment in Structured Notes may be liquidated with little or no notice. With respect to loanable value, please contact Citibank." Slipp Decl. Ex. A, at 5.

("[W]arnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." ).  The Structured Notes Master Agreement itself acknowledges this fact on its last page, when it notes that "[a] more complete explanation of the risks associated with an investment in a Structured Note will be set out in the applicable Issuer Offering Documents (which will be made available by Citibank to the client)." Slipp Decl. Ex. A at 6. According to the Complaint, these Offering Documents were never in fact made available to Plaintiffs. Compl. ¶ 50

In this context, we have little trouble concluding that they have adequately demonstrated the materiality of at least some of the misstatements and omissions identified in the Complaint. *See Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985) (holding that a § 10(b) claim "may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance").

### 2. Scienter

Defendants also argue that the § 10(b) claim should be dismissed because Plaintiffs have failed to adequately plead scienter, defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). To establish scienter at the pleadings stage in a § 10(b) case, plaintiffs must "allege facts that give rise to a strong inference of fraudulent intent." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). They can do so in one of two ways: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 307–08. Recklessness in this context means "conduct which is highly unreasonable and which represents an extreme departure from

the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Honeyman v. Hoyt* (*In Re Carter-Wallace Sec. Litig.*), 220 F.3d 36, 39–40 (2d Cir. 2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)).

Plaintiffs have alleged no facts showing that Defendants "benefited in some concrete and personal way from the purported fraud." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). The only motive for the fraud identified in the Complaint is corporate, not personal.  Compl. ¶ 68 (alleging that Defendants used Plaintiffs' accounts "as a 'dumping ground' in an illiquid market for structured note products that other Citigroup investors were desperate to unload."). Plaintiffs have therefore failed to demonstrate that Defendants possessed the kind of motive required for a § 10(b) claim. *See ECA,* 553 F.3d at 198  ("Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry.").

The Complaint does, however, describe conduct that was "highly unreasonable." Specifically, Defendants' repeated failure to provide Plaintiffs with prospectuses or other detailed written information about the complex debt instruments they were purchasing appears to us to represent an "extreme departure from the standards of ordinary care" provided investors. *See, e.g., Brown v. E.F. Hutton Group, Inc.,* 991 F.2d 1020, 1033 (2d Cir. 1993) (noting that investors are entitled to "full and objective disclosure of non-misleading factual material" related to the securities they invest in); Wybiral Decl., Ex. B. (NASD Notice to Members No. 05-59), at 3 (noting that investors who purchase structured products "will, prior to purchase, receive a

preliminary prospectus supplement that describes the characteristics and risks of the structured product being offered.").

In addition, Plaintiffs allege that Defendants acted in conscious violation of the Federal Reserve Board's Regulation U, which limits the amount of credit that banks may extend to investors to purchase margin stock. *See* 12 C.F.R. §§ 221.1–221.7. Plaintiffs claim that CPB and CFSC employees intentionally lied when they filled out the U-1 Forms that banks must complete in order to demonstrate compliance with Regulation U, and that they did so in order to avoid the 50% limit the regulation imposes on the amount that investors can borrow when purchasing stock. Compl. ¶¶ 53, 60, 85. These allegations provide strong evidence of "conscious misbehavior" on Defendants' part.

Defendants' active efforts to circumvent federal regulations designed to protect investors against the very high risks associated with trading on the margin suggests, at the very least, that they knew, or should have known, of the dangers associated with Plaintiffs' extremely leveraged investment strategy, and nonetheless failed to inform them of these dangers. We find this sufficient to establish a "strong inference" of fraudulent intent that is, as required by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4 *et seq.*, "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 324 (2007). We therefore conclude that Plaintiffs have met their burden of pleading scienter under Rule 9(b) and the PSLRA—at least with respect to some of the defendants named in the Complaint.

As Defendants point out, plaintiffs who allege fraud against multiple defendants must provide sufficient facts to "inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir. 1987).

11

Furthermore, when the defendants are corporations, plaintiffs must plead sufficient facts to "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

Plaintiffs have met this burden with respect to defendants CFSC and CPB. The fact that, on multiple occasions, employees of both companies are alleged to have performed their professional duties in a consciously wrongful or reckless manner establishes a "strong inference" of corporate scienter. *See City of Monroe Employees' Ret. Sys. v. Hartford Fin. Servs. Group*, 10 Civ. 2835, 2011 U.S. Dist. LEXIS 106046 , at *48 (S.D.N.Y. Sept. 19, 2011) ("Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority."); *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 481-483 (S.D.N.Y. 2006) ("[A] corporation's scienter may be inferred from its employees" when those employees are "widely engaged" in misconduct). These facts also adequately "inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio*, 822 F.2d at 1247.

Plaintiffs have also met this burden with respect to defendant Citibank. Documents integral to the Complaint, such as the Structured Notes Masters Agreement, identify Citibank as the "agent who assist[ed] the client to purchase the Notes" and name Citibank as the author of the prospectus and other offering documents with which, under ordinary circumstances, Plaintiffs would have been provided.  These documents thus establish a plausible inference that Citibank played an active and important role in designing and selling the notes and are therefore sufficient to establish Citibank's connection to the alleged fraud with sufficient particularity to satisfy the requirements of Rule 9(b) and the PSLRA. *See Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2304–5 ( 2011) (indicating that one of the factors used to

12

determine whether a corporate entity can be held liable for misrepresentations in securities documents is whether "anything on the face of the [documents] indicate that any statements therein came from" that entity).

Plaintiffs provide, however, no allegations tying the other two defendants—namely, Citigroup and CGMI—to the fraudulent acts and omissions identified in the Complaint. They simply note that CGMI is the corporate parents of CPB and that CGMI is "the brokerage and securities arm of Citigroup." Compl. ¶¶ 4-5, 7. However, the mere existence of a parent-subsidiary or affiliate relationship is not on its own sufficient to impute the scienter of the subsidiary to the parent or affiliate. Instead, plaintiffs must demonstrate that the parent or affiliate possessed some degree of control over, or awareness about, the fraud. *Chill v. GE*, 101 F.3d 263, 270-271 (2d Cir. 1996); *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 483 (S.D.N.Y. 2006).

We therefore dismiss the §10(b) claim against Citigroup and CGMI. However, in the interest of justice, we grant the Plaintiffs leave to amend the Complaint to better detail, with particularity, the part these defendants played in the allegedly fraudulent acts and omissions. Fed. R. Civ. P. 15(a) ("[L]eave to amend shall be freely given when justice so requires.").

### 3. Reasonable Reliance

Defendants argue that the §10(b) claim should also be dismissed because Plaintiffs have failed to demonstrate adequately the reasonableness of their reliance, given the various no-representations clauses and other waiver of liability in the Structured Notes Master Agreement and Initial Purchaser Representations they signed before purchasing the notes.

We do not agree. We cannot give effect to contractual provisions that amount to a general waiver of liability under §10(b). *Vacold LLC v. Cerami*, 545 F.3d 114, 122 (2d Cir. 2008)

13

("[W]e do not give effect to contractual language, such as the language here, purporting to be a general waiver or release of Rule 10b-5 liability altogether"); Exchange Act § 29(a), 15 U.S.C. § 78cc(a) ("Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void.").

Courts can give effect to no-representations clauses that disclaim reliance on a specific set of representations and thus effect only a partial waiver of liability under §10(b). They only do so, however, when these clauses are the product of negotiations between "sophisticated business entities" of roughly equal bargaining power. *Harsco Corp v. Segui,* 91 F.3d 337, 343-344 (2d Cir. 1996); *see also In re One Communs. Corp.,* 07 Civ. 3905, 2009 U.S. Dist. LEXIS 29012, at *30-32 (S.D.N.Y. Mar. 31, 2009) (finding no-representations clause to be effective when the product of several months of negotiations, during which both parties consulted with advisers and scrutinized one another's books).

This exception to the general rule against allowing parties to contract away their liability under §10(b) does not apply to the circumstances of this case. By disclaiming reliance on "any representations made by CFSC with respect to the Note," Slipp Decl. Ex. B ¶1, and on "any investigations... [or] representations, express or implied, with respect thereto" that "Citibank or any of its affiliates or any person acting on its or their behalf may have conducted with respect to such Structured Notes," Slipp Decl. Ex. A., ¶1, Plaintiffs agreed to a general, rather than a partial, waiver of their rights under §10(b). In addition, there is no evidence that the disclaimers are the product of detailed negotiations between sophisticated business entities with roughly equal bargaining power. They appear instead to be standard contractual "boilerplate." These are

14

not the kinds of disclaimers to which the exception applies. *Katz v. Image Innovations Holdings, Inc.*, 06 Civ. 3707, 2008 U.S. Dist. LEXIS 91449, at *15-16 (S.D.N.Y. Nov. 3, 2008).

In order to determine the reasonableness of Plaintiffs' reliance, we do not therefore rely upon the no-representations clauses. Instead we consider "the entire context of the transaction, including the sophistication of the parties, the content of written agreements, and the complexity and magnitude of the transaction." *One Communs. Corp v. JP Morgan SBIC LLC*, 381 Fed. App'x. 75, 79 (2d Cir. 2010). Factors that courts examine when assessing the "context of the transaction" include: "(1) The sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of longstanding business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations." *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333 (2d Cir. 2011) (quoting *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993).

Different factors cut in opposite directions. The size of the transactions involved in this case obviously makes Plaintiffs' reliance upon the sparse offering documents and verbal assurances of CPB and CFSC employees less reasonable. So too does the fact that Plaintiffs had ample opportunity to detect the fraud. The fact that the Structured Notes Master Agreement references the various offering documents with which Plaintiffs claim they were not provided, Slipp Decl. Ex. A., suggests that Plaintiffs were at the very least negligent in not demanding to see these documents. In the Second Circuit, "[a]n investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth." *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993).

On the other hand, although Plaintiffs may have acted negligently in failing to demand more information about the notes, negligence is not on its own sufficient, in this Circuit, to preclude reasonable reliance. Instead, what "minimal diligence" requires is only that plaintiffs not act recklessly. In other words, "[a] plaintiff bears only the burden of negating its own 'recklessness,' once the issue of diligence is raised." *Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1015-1016 (2d Cir. 1989). The Second Circuit has found that investors act recklessly when they misread the offering documents provided to them. *See, e.g., Starr v. Georgeson S'holder, Inc.*, 412 F.3d 103, 110 (2d Cir. 2005) (plaintiff lacked reasonable reliance when only "a superficial or careless reading" of the documents would have led investors to conclude erroneously that they omitted a material fact); *Brown*, 991 F.2d at 1033 (reliance was unreasonable because offer documents provided the investors "full and objective disclosure of non-misleading factual material" which investors nonetheless ignored).

A failure to demand additional information strikes us, however, as a qualitatively different kind of failure than the failure to carefully read documents already in one's own possession. In the first case, it is the seller's responsibility to provide non-misleading material information about the securities to the investor. *Data Probe Acquisition Corp. v. Datatab, Inc.*, 722 F.2d 1, 5-6 (2d Cir. 1983). In the second case, it is the buyer's responsibility, to carefully read the offering documents. *See, e.g., Starr*, 412 F.3d at 103; *Brown*, 991 F.2d at 1032-33. Here, investors were not provided with the "full and objective disclosure of non-misleading factual material" to which the Second Circuit, in *Brown*, said they were entitled. *Brown*, 991 F.2d at 1033. In this context, we are unwilling to conclude that Plaintiffs acted recklessly.

In reaching this conclusion, we take into account Plaintiffs' relative unsophistication and inexperience with complex debt instruments. Prior to 2006, when Ghilardi first suggested he

16

invest in structured notes, Valentini had never invested in complex debt instruments of this kind, Compl. ¶ 31. Furthermore, there is no evidence that either he or Windsor consulted with financial or legal experts for advice in their transactions with CFSC. Plaintiffs do not therefore appear to have possessed the investing experience or expertise in financial matters that is the mark of the sophisticated investor. *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 195-196 (2d Cir. 2003) (defining a sophisticated investor as one who has "knowledge and experience in financial and business matters … and could readily evaluate the risks of the transaction").

We also take into account Valentini's longstanding friendship with CFSC broker, Ricardo Ghilardi. Construing all inferences in favor of Plaintiffs—as we must at this stage in the proceedings—we assume that all of Valentini's subsequent transactions with Citibank and its affiliates were colored by the personal nature of the relationship that first brought Valentini to the bank.

Finally, we take into account the fact that under New York law CFSC owed Plaintiffs a fiduciary duty, at least with respect to some of the notes,[6] to "use reasonable efforts to give [their clients] information relevant to the affairs . . . entrusted to them," *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999) , and to "give honest and complete information when recommending [a] purchase or sale." *Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1302 (2d Cir. 2002).

Because many of the factors relevant to the analysis of the reasonableness of Plaintiffs' reliance favor Plaintiffs, and because we find that Plaintiffs were negligent but not reckless in

---

[6] *See* discussion *infra,* III.C.3.

failing to demand more information from Defendants about the notes, we conclude that Plaintiffs
have alleged sufficient facts to establish the reasonableness of their reliance.

### 4. Loss Causation

Defendants also move to dismiss Plaintiffs' §10(b) claim on the grounds that Plaintiffs
have not adequately established loss causation because they have not demonstrated that the
harms they suffered when the value of their investments declined was the result of Defendants'
misrepresentations, rather than the result of other external factors, like the global financial crisis,
or the TAM airline crash. We disagree.

"[L]oss causation has to do with the relationship between the plaintiff's investment loss
and the information misstated or concealed by the defendant." *Lenteli*, 396 F.3d at 174-75. To
establish loss causation, "a plaintiff must allege . . . that the subject of the fraudulent statement or
omission was the cause of the actual loss suffered," *Suez Equity Investors, L.P. v. Toronto-
Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001), or in other words that the loss was the result of
"the materialization of the concealed risk" such that "plaintiffs would have been spared all or an
ascertainable portion of that loss absent the fraud." *Lentell*, 396 F.3d at 173. The plaintiff must
also show that "the damage suffered was a foreseeable consequence of the misrepresentation."
*Citibank*, 968 F.2d at 1495.

Plaintiffs have satisfactorily alleged both elements of loss causation. With respect to the
losses that Valentini sustained when his TAM airline-linked note converted into shares of the
underlying stock, Plaintiffs have alleged sufficient facts to establish a plausible inference that the
subject of one of Defendants' alleged misrepresentations—namely, the convertibility of the
note—was the cause of Valentini's losses. Compl. ¶¶ 32, 45. This loss was also a foreseeable
consequence of investing in a convertible note of that kind, and one of the reasons why industry

18

regulations suggest brokers restrict these products to experienced investors. *See* Wybiral Decl. Ex. G, at 7.

The losses Plaintiffs sustained when CPB liquidated their notes similarly appear to have been the materialization of a risk that Defendants are alleged to have misrepresented: namely, the risk of liquidation that we earlier found to be incompletely disclosed in the Structured Notes Master Agreement. *See* III.A.1. This risk was also foreseeable—again, as demonstrated by the existence of federal regulations, such as Regulation U, that attempt to protect investors, and the larger economy, from the harms associated with unlimited margin trading.

The fact that the harms occurred during a period of financial crisis obviously complicates the causal inquiry, by raising the possibility that Plaintiffs' losses were proximately caused by the external crisis rather than by Defendants' misrepresentations. Difficult causal distinctions of this kind are not appropriately resolved on a motion to dismiss, however. *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 197 (2d Cir. 2003) ("[I]f the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation will not have been established. But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.").

### 5. Time-barred

Defendants also argue that Plaintiffs' claim of securities fraud is time-barred under 28 U.S.C. § 1658(b), which requires § 10(b) claims to be brought within two years "after the discovery of facts constituting the violation." They argue that the various losses Plaintiffs sustained in 2007 and 2008 should have informed them that the structured notes were not the conservative investments Defendants represented them to be, and therefore constituted a

"discovery of the facts constituting the violation" that took place over two years before Plaintiffs filed suit, on February 28, 2011.

We do not agree. In *Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010), the Supreme Court held that among the facts a plaintiff must discover, or would have discovered had he undertaken a reasonably diligent investigation, in order to trigger the two year limitations period in § 1658(b) are the facts that demonstrate defendant's scienter. *Id.* at 1798. The Second Circuit has held that a "plaintiff 'discovers' a particular fact when a plaintiff obtains or would have obtained sufficient information about that fact to adequately plead it in a complaint." *City of Pontiac Gen. Emples. Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011). With respect to scienter, this means that a plaintiff must—or a reasonably diligent plaintiff would have—uncovered sufficient facts to "'giv[e] rise to a strong inference that the defendant acted with the required state of mind' such that 'it is at least as likely as not that the defendant acted with the relevant knowledge and intent.'" *City of Pontiac*, 637 F.3d at 175 (quoting *Merck*, 130 S. Ct. at 1796).

As we discussed above, the facts in the Complaint that give rise to a strong inference of scienter are: (a) the fact that Defendants repeatedly failed to provide Plaintiffs with prospectuses or other, similarly detailed, written information about the notes; (b) the fact that CFSC and CPB employees, on at least three occasions, completed the Federal Reserve U-1 Forms with intentionally incorrect information. Plaintiffs' claim will thus be time-barred if they discovered —or a reasonably diligent investor would have discovered—these facts prior to February 28, 2009.

It is not obvious from the Complaint when Plaintiffs actually discovered these facts. Plaintiffs claim that they first learned that the notes they had purchased were "high risk" complex debt instruments, not the safe investments they believed them to be, only when they

consulted an expert in structured notes in July 2010. Compl. ¶ 93. The Complaint does not, however, make clear when Plaintiffs' came to learn that Defendants' failure to provide them prospectuses or other information about the notes was itself problematic. Nor is it obvious from the face of the Complaint when Plaintiffs discovered that Defendants had filled out the U-1 Forms with incorrect information. Plaintiffs claim that these forms were blank when Valentini signed them and that it was only after Valentini faxed them back that CPB employees filled them out. *Id.* ¶¶ 53, 60, 85. As a result, Plaintiffs may not have learned that the forms were incorrectly completed until well after the fact. All that is clear is that at some point in time, Plaintiffs came into possession of at least one partially filled out U-1 Form, which they attached to their opposition brief. *See* Wybiral Decl., Ex. N. Construing all inferences in their favor, we infer therefore that Plaintiffs only learned the relevant facts after February 28, 2009. We then must ask: would a reasonably diligent investor have learned of these facts prior to this point?

This is a difficult question to answer. Obviously, a sophisticated investor would have realized early on that Defendants' failure to provide him with anything more than "rudimentary emails" describing the multimillion dollar investments he was intending to purchase was a departure from the ordinary standard of care provided investors. A sophisticated investor would also presumably not have allowed CPB employees fill out his U-1 Form for him. But Plaintiffs were not sophisticated investors. Furthermore, when confronted with "storm warnings"[7] that the notes were not the safe investments Defendants represented them to be, Plaintiffs did attempt to acquire more information. After the March 26, 2008 liquidation of $4 million of Windsor's investments, Valentini repeatedly asked CPB private bankers for information about how he could

---

[7] *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350-352 (2d Cir. 1993) ("[W]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry. Such circumstances are often analogized to 'storm warnings.'").

unwind his investments in structured notes, in order to avoid further liquidations. He was told that there was nothing he could do other than sell the notes back to Citigroup at a loss. Compl. ¶¶ 66, 69. He also sent letters to the bank, requesting more information about the impact of the global financial crisis on his investments, and sent a fax to CPB private banker Roberto Martins, requesting copies of the documents relating to the March 26, 2008 liquidation. The information, and documentation, was not forthcoming. *Id.* ¶¶ 73, 74, 78–80. CPB and its agents repeatedly denied his requests for more information, and/or failed to reply to his letters, faxes and emails. Instead, CPB Brazil advised Valentini to have a lawyer contact Citibank in New York for assistance. *Id.* ¶ 80.

We thus conclude that Valentini, acting on his own and Windsor's behalf, fulfilled his responsibility of reasonable diligence, notwithstanding the various "storm warnings" provided him not only by his financial losses but by Defendants' repeated refusals to provide him the information and documentation he requested. As the Supreme Court declared in *Merck*, evidence of "storm warnings" can help courts identify when a reasonably diligent plaintiff would have begun investigating "[b]ut the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation.'" *Merck*, 130 S. Ct. at 1798. Storm warnings, in other words, are not on their own sufficient to trigger the two-year limitation period in § 1658(b). *Id.* at 1798. Furthermore, "in the statute of limitations context … dismissal is appropriate only if a complaint clearly shows the claim is out of time." *Harris v. City of New York*, 186 F.3d 243 (2d Cir. 1999). Because the complaint does not clearly show that Plaintiffs learned of the facts establishing a strong inference of Defendants' scienter before February 28, 2009, we deny Defendants' motion to dismiss the § 10(b) claim as time-barred.

22

### 6. Jurisdiction

Defendants' final challenge to Plaintiffs' §10(b) claim relies upon the Supreme Court's recent holding in *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010) that § 10(b) applies only when (1) "the purchase or sale [of a security] is made in the United States", or (2) "[the transaction] involves a security listed on a domestic exchange." *Id.* at 2886. Defendants argue that because the ELKS and other structured notes Plaintiffs purchased from them were not purchased in the United States, and not themselves listed on a domestic exchange, *Morrison* precludes their §10(b) claim.

We disagree. It is clear that the notes at issue in this case were not purchased in the United States. Plaintiffs represented as much in the Initial Purchaser Representations and Structured Notes Master Agreement, Slipp Decl. Ex A, ¶12(vi); Slipp Decl. Ex B, ¶4, and have not subsequently disputed these representations. Instead, they argue that because the loans used to purchase the notes were taken out in the United States, the transactions satisfy *Morrison*'s transactional test. Pls.' Mem. Opp. Mot. Dismiss, at 28–30. *Morrison* is very clear, however, that the reach of §10(b) is determined by the location of the "purchase or sale" itself, rather than by the location of activities that led up to and allowed that purchase or sale. Hence, we find it easy to conclude that the first prong of the *Morrison* test is not satisfied.

The second prong is more complicated. Although none of the notes were listed on a domestic exchange, they were all *linked* to securities listed on a domestic exchange—namely, the NYSE. We also know from the Complaint that at least some of the notes possessed a convertible feature that meant that if and when a knock-in event occurred, they would convert into securities listed on the NYSE. It was because of this feature that Valentini inherited shares in the Brazilian airline companies that he was subsequently forced to resell. Compl. ¶ 52. We are therefore

23

confronted with a question that thus far no court appears to have addressed: does a transaction in securities that may, under certain circumstances, convert into domestically-traded stock qualify as a "transaction involving securities listed on a domestic exchange," as the second prong of the *Morrison* test requires?

We find that it does. At least one court in this District has found the purchase of a derivate instrument (in that case, a swap agreement) whose value was linked to the value of stock traded on a foreign exchange to constitute the "functional equivalent" of a purchase of that foreign-traded stock. *Elliott Assocs. v. Porsche Automobil Holding SE*, 759 F. Supp. 2d 469, 474-476 (S.D.N.Y. 2010). In reaching this conclusion, the court adopted the "economic reality" approach that the Supreme Court has suggested courts use when determining the reach of §10(b)'s application. *See Reves v. Ernst & Young*, 494 U.S. 56, 63 n. 2 (1990) (The economic reality approach "permits the SEC and courts sufficient flexibility to ensure that those who market investments are not able to escape the coverage of the Securities Acts by creating new instruments that would not be covered by a more determinate definition."); *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) (holding that, when interpreting the term "security," "form should be disregarded for substance and the emphasis should be on economic reality"). Because it found the swap agreements to be so closely linked in value to their foreign-traded shares that they functioned "in economic reality" as equivalent to a purchase of those shares, the court concluded that 10(b) did not apply. *Elliott Assocs.*, 759 F. Supp. 2d at 476.

Applying the same reasoning to the circumstances of this case, we reach the opposite result. Here, Plaintiffs purchased securities that were linked to domestically-traded, rather than foreign-traded securities. Like the securities at issue in *Elliott Associates*, the value of the notes rose and fell as the price of the shares to which they were linked rose and fell. Not only were the

24

notes linked to NYSE-traded securities, at least some of the notes were also convertible into those securities. What this means is that when Plaintiffs purchased these convertible notes, they were in effect purchasing a put option on those NYSE-traded stocks. Wybiral Decl. Ex. G (FINRA Notice 05-59), at 2.

The Second Circuit has held that the purchase of an option on a security is equivalent, for purposes of § 10(b) liability, with a purchase of that security. *Caiola v. Citibank, N.A.*, 295 F.3d 312, 327 (2d Cir. 2002). Under the "economic reality" approach to the analysis of 10(b)'s application, we therefore conclude that at least some of the transactions at issue in this case—namely, those that involved convertible securities—constitute "transactions involving securities traded on domestic exchanges" and thereby satisfy *Morrison*'s second prong.[8] We leave it to a later stage in the litigation to determine which of the notes at issue in this case were convertible products, and therefore subject to the jurisdiction of §10(b), and which were not. For now, we construe all inferences in favor of Plaintiffs and assume that §10(b) reaches all of the transactions described in the Complaint.  Defendants' motion to dismiss the claim on jurisdictional grounds is therefore denied.

## B.  The Investment Advisors Act Claim

Plaintiffs claim that Defendants violated §215 of the IAA, 15 U.S.C. § 80b-15, when they invested Plaintiffs' funds without their "knowledge, consent, instructions or authorization in very risky, unsuitable and unsolicited instruments, all the while charging commissions, margin interest and other account fees in the thousands of dollars at a time." Compl. § 98.

---

[8] We are guided in reaching this conclusion by the fact that none of the notes at issue in this case were listed on foreign exchanges.  Construing §10(b) to apply to the notes therefore poses no threat that federal securities law will be used to "regulate foreign securities exchanges"—the primary problem the *Morrison* test sought to avoid. *Morrison,* 130 S. Ct. at 2884-86. It means, simply, that federal law can apply to securities to which no other state's regulatory framework obviously applies. *See* Slipp Decl. Ex. B, ¶4 ("the Note has not been, nor will it be, registered under the Securities Act of 1933…or any state or *foreign* securities law) (emphasis added); Slipp Decl. Ex. A, at 5 ("Structured Notes are not registered under any securities laws.").

This claim must be dismissed. Section 215 of the IAA allows individuals a private right of action to seek the rescission of contracts that violate the Act's provisions. *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 24 (1979). It confers, however, no right of action on any party not subject to an investment advisory contract. *Norman v. Salomon Smith Barney, Inc.*, 350 F. Supp. 2d 382, 388 (S.D.N.Y. 2004) ("[T]he remedies under the IAA are only available where an investor brings suit on the investment adviser's allegedly improper conduct (or vice versa) pursuant to a contract for services.").

Plaintiffs have not alleged, nor provided any evidence, to demonstrate that Defendants contracted with them specifically to provide investment advice. *See* 15 U.S.C. § 80b-2(a)(11) (defining an investment adviser as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities…"). Instead, they allege merely that Defendants provided them investment advice in the course of their professional duties as brokers of Plaintiffs' nondiscretionary investment accounts. This is insufficient to establish an investment advisor contract, or relationship. *See Bogart v. Shearson Lehman Bros.*, No. 91 Civ. 1036, 1993 U.S. Dist. LEXIS 1182, at *7 (S.D.N.Y. Feb. 3, 1993) (dismissing IAA claim where defendant agreed to serve as plaintiff's broker but did not receive any compensation from defendant other than commissions for the trades for failing to establish the existence of an investment adviser contract).

For this reason, Defendants' motion to dismiss the IAA claim is granted.

## C. The State Law Claims

### 1. Common Law Fraud

"To state a claim for common law fraud in New York, a plaintiff must show a material representation or omission of fact, made with knowledge of its falsity, with scienter or an intent to defraud, upon which the plaintiff reasonably relied, and that such reliance caused damage to the plaintiff." *Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 327 (S.D.N.Y. 2006) (internal citations omitted). "The elements of common law fraud are, therefore, essentially the same as those required to state a claim under Section 10(b) and Rule 10b-5." *Pits, Ltd. v. American Express Bank Int'l*, 911 F. Supp. 710, 719 (S.D.N.Y. 1996). Both claims are also governed by the heightened pleading standards set forth in Rule 9(b). *Renner v. Chase Manhattan Bank, N.A.*, 85 Fed. Appx. 782, 783-784 (2d Cir. 2004).

"Since the pleading standards for Section 10(b) and Rule 10b-5 claims are the same as common-law fraud standards, it follows that if one is dismissed, the other should be as well." *Fezzani v. Bear, Stearns & Co.*, 592 F. Supp. 2d 410, 426 (S.D.N.Y. 2008). The converse is also true. *Jacquemyns v. Spartan Mullen Et Cie, S.A.*, No. 10 Civ. 1586, 2011 U.S. Dist. LEXIS 136579, at *28-29 (S.D.N.Y. Nov. 23, 2011); *Gruntal & Co., Inc. v. San Diego Bancorp*, 901 F. Supp. 607, 615 (S.D.N.Y. 1995). Accordingly, for the reasons outlined above, Defendants' motion to dismiss is denied with respect to defendants CPB, CFSC and Citibank, and granted with respect to defendants Citigroup and CGMI.

### 2. Martin Act Preemption

Defendants assert that all but Plaintiffs' fraud claims are preempted by New York's Martin Act, N.Y. Gen. Bus. L. § 352-c (2003). However, New York's highest court, the New York Court of Appeals, recently held that the Martin Act does not preempt non-fraud common law claim that are not "entirely dependent on the Martin Act for [their viability]." *Assured Guar. (UK) Ltd. v J.P. Morgan Inv. Mgt. Inc.*, No. 227, 2011 N.Y. LEXIS 3658, at *12 (N.Y. Dec 20,

2011). We therefore must conclude that the various common law claims Plaintiffs assert in the Complaint are not preempted by the Martin Act and proceed to analyze the other arguments that Defendants make in favor of dismissing the non-fraud common law claims. *See Bank of New York v. Amoco Oil Co.*, 35 F.3d 643, 650 (2d Cir. 1994) (noting that a federal court sitting in diversity jurisdiction in New York must give greatest weight to the New York Court of Appeals' interpretation of state law).

### 3. Breach of Fiduciary Duty

Plaintiffs claim that Defendants breached their fiduciary duty when they recommended Plaintiffs invest in unsuitable instruments and committed the various omissions and misstatements discussed above. Defendants argue that they could not have breached their fiduciary duty towards Plaintiffs, as Plaintiffs claim, because they had no duty to breach, given the explicit and implied disclaimers of fiduciary obligation found in the Structured Notes Master Agreement and Initial Purchaser Representations.

We agree, in part. Under New York law, contractual disclaimers of fiduciary duty are enforceable when sufficiently explicit. *See, e.g., Summit Props. Int'l, LLC v. LPGA,* No. 07 Civ. 10407, 2010 U.S. Dist. LEXIS 58444, at *19-20 (S.D.N.Y. June 14, 2010); *Seippel v. Jenkens & Gilchrist, P.C.,* 341 F. Supp. 2d 363, 381-82 (S.D.N.Y. 2004). The disclaimer in the Initial Purchaser Representations—which states that "CFSC is not acting as fiduciary for" the purchaser—provides a "clear and unambiguous" disclaimer of this sort. Slipp Decl. Ex. B, 1 ¶1. To the extent Plaintiff's claim for breach of fiduciary duty arises out of actions undertaken in connection with those notes governed by the Initial Purchaser Representations, it must be dismissed.

28

This is not true, however, of the fiduciary duty claims arising out of the notes purchased under the Structured Notes Master Agreement. Although the Structured Notes Master Agreement contains representations in which Windsor expressly disclaims reliance "on any investigation that Citibank or any of its affiliates or any person acting on its or their behalf may have conducted with respect to [the] Structured Notes" as well as on "representations... explicit or implied, with respect thereto," Slipp Decl. Ex. A, ¶1, and assumed sole responsibility for determining the note to be a suitable investment, *Id.* ¶10, it contains no express disclaimers of fiduciary duty nor does it disclaim the general duties brokers in New York law must fulfill: namely, to "use reasonable efforts to give [their clients] information relevant to the affairs . . . entrusted to them," *Press,* 166 F.3d at 536, and to "offer honest and complete information when recommending [a] purchase or sale." *De Kwiatkowski,* 306 F.3d at 1302. Plaintiffs' breach of fiduciary claim, as applies to those notes governed by the Structured Notes Master Agreement, cannot therefore be dismissed on the grounds that the duty was contractually disclaimed.

Nor can it be dismissed as time-barred, as Defendants argue. Although a three-year statute of limitations usually applies to actions seeking money damages for breach of fiduciary duty, *Bouley v. Bouley,* 797 N.Y.S.2d 221, 223 (N.Y. App. Div. 2005), when allegations of actual fraud are essential to a claim—as is the case here—New York courts instead apply the six-year statute of limitations that governs fraud. *IDT Corp. v. Morgan Stanley Dean Witter & Co.,* 907 N.E.2d 268, 272 (N.Y. 2009). Plaintiffs' claim will therefore be time-barred only if more than six years have passed since the date of the fraudulent act, or if more than two years have passed since the plaintiffs "discovered the fraud or could, with due diligence, have discovered it." *Kaufman v. Cohen,* 760 N.Y.S.2d 157, 167 (N.Y. App. Div. 2003) (citing N.Y. C.P.L.R. § 213(8)). Under New York law, a plaintiff "could, with due diligence, have discovered" the fraud

when provided sufficient facts to place him on "inquiry notice." *Aldrich v. Marsh & McLennan Cos., Inc.*, 861 N.Y.S.2d 30, 31 (N.Y. App. Div. 2008). However, "defendants bear a heavy burden in establishing that the plaintiff was on inquiry notice as a matter of law." *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.,* 840 F. Supp. 243, 249-252 (S.D.N.Y. 1993) (internal quotes omitted).

All the allegations in the Complaint took place within six years of the Plaintiffs filing suit. Furthermore, there are no facts that suggest Plaintiffs either learned, or were put "on inquiry notice" of the fraud prior to February 28, 2009. The fact that they suffered serious investment losses is not by itself enough to constitute inquiry notice. *CSAM Capital, Inc. v Lauder*, 885 N.Y.S.2d 473, 478 (N.Y. App. Div. 2009); *Saphir Intl. SA v. UBS PaineWebber Inc.,* 807 N.Y.S.2d 58, 60 (N.Y. App. Div. 2006). Instead, defendants must provide "uncontroverted evidence clearly demonstrat[ing] when the plaintiff should have discovered the fraudulent conduct." *Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 427 (2d Cir. 2008). Evidence of this sort includes "the existence of criminal and federal or state agency investigations," the "presence of factual discrepancies in available documents," and "the assertion of virtually identical counterclaims in a prior lawsuit." *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.,* 840 F. Supp. 243, 250-252 (S.D.N.Y. 1993) (citing cases).

Given the absence in this case of any of the kinds of facts that courts have in the past found sufficient to provide "uncontroverted evidence" that plaintiffs were on notice of the fraud, we deny Defendants' motion to dismiss the breach of fiduciary duty claim, as it relates to notes governed by the Structured Notes Master Agreement. However, for the reasons stated above, we grant the motion with respect to all actions arising out of the transactions governed by the Initial Purchaser Representations.

30

### 4.  Breach of Contract

Defendants argue that Plaintiffs' breach of contract claim must be dismissed because Plaintiffs fail to identify what specific provisions of the contract they claim Defendants breached. We agree. "For a breach of contract claim, Plaintiff must provide specific allegations as to an agreement between the parties, the terms of that agreement, and what provisions of the agreement were breached as a result of the acts at issue." *Levy v. Bessemer Trust Co., N.A.,* No. 97 Civ. 1785, 1997 U.S. Dist. LEXIS 11056, at *14 (S.D.N.Y. July 30, 1997). In their Complaint, Plaintiffs allege that Defendants were contractually obligated to "abide by all applicable FINRA, state and federal regulations." Compl. ¶ 130. However, Plaintiffs do not provide any evidence, or factual allegations, in support of this claim. They do not, for example, describe where this contractual provision can be found. Certainly it is not present in either the Structured Notes Master Agreement or the Initial Purchaser Representations. Slipp Decl. Exs. A, B. Vague and conclusory allegations of this kind are insufficient to make out a claim for breach of contract that can survive a motion to dismiss. *Iqbal,* 129 S. Ct. at 1949. We therefore grant Defendants' motion to dismiss, although we grant Plaintiffs leave to amend their Complaint to correct these deficiencies, pursuant to Federal Rule of Civil Procedure 15(a).

### 5.  Negligence

Under New York law, the elements necessary to state a cause of action sounding in negligence are: "(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Akins v. Glens Falls City Sch. Dist.,* 53 N.Y.2d 325, 333 (1981). Defendants raise a variety of arguments to support dismissal of Plaintiffs' negligence, negligent supervision and negligent misrepresentation claims.

31

First, they argue that all three claims must be dismissed because the disclaimers of fiduciary duty in the offering documents absolved Defendants of any "duty to Plaintiffs beyond executing the transactions at Plaintiffs' direction." Defs'. Rep. Mem. Supp. Mot. Dismiss, at 13. This argument is unpersuasive. The duty of reasonable care, in contrast to the fiduciary duty, "arises not by agreements or imposition of the parties governing their relations, but by operation of law." *De Kwiatkowski v. Bear Stearns & Co.*, 126 F. Supp. 2d 672, 690-701 (S.D.N.Y. 2000), *rev'd on other grounds*, 306 F.3d 1293 (2d Cir. 2002); *Eaves Brooks Costume Co. v. Y.B.H. Realty Corp.*, 76 N.Y.2d 220, 226-227 (N.Y. 1990). Therefore, the mere fact of a contractual disclaimer is insufficient to conclude that no duty exists. *See Brown v. NFL*, 219 F. Supp. 2d 372, 380-381 (S.D.N.Y. 2002) ("A duty of care is a general obligation imposed by tort.... [and is] not [a] creature[] of contract"); Prosser and Keeton, On the Law of Torts § 92 at 655 (5th ed. 1984) ("[T]ort obligations are imposed apart from and independent of promises made and therefore apart from any manifested intention of parties to a contract or other bargaining transaction."). Even if we agreed that Defendants had fully disclaimed their fiduciary duty with respect all of the notes—which we do not, *see* III.C.3, *supra*— this fact would be insufficient, on its own, to justify dismissal, given the long line of cases holding that even managers of nondiscretionary accounts owe their clients a duty to exercise reasonable care in performing their obligations. *See De Kwiatkowski,* 306 F.3d at 1305-1306 (collecting cases).

Second, Defendants argue that the three negligence claims should be dismissed because Plaintiffs have failed to allege that Defendants' alleged misrepresentations and omissions were the direct and proximate cause of their loss, given the "intervening event" of the global financial crisis of 2007 and 2008. Defs'. Mot. Dismiss at 28. Defendants made the same argument with

respect to Plaintiffs' federal securities claim. For the same reason we dismissed that argument as applied to the §10(b) claim, we dismiss is as unpersuasive here. *See* III.A.4, *supra*.

Third, Defendants argue that the negligence claims are foreclosed by the "economic loss doctrine," which bars recovery in tort for economic losses resulting from a breach of contractual obligations. *See 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.,* 711 N.Y.S.2d 391 (N.Y. App. Div. 2000) ("Pure economic losses (without property damage or personal injury) are not recoverable in a negligence action, and . . . a claimant suffering purely financial losses is restricted to an action in contract for the benefit of its bargain."). This argument is also unpersuasive, for two reasons. First, as discussed above, Plaintiffs had been unable to identify a contractual provision that Defendants breached. We cannot assume therefore that Plaintiffs' losses are a consequence of contractual breach. Second, the economic loss doctrine does not apply to negligence claims arising, as is the case here, out of "the violation of a professional duty." *Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 15-18 (2d Cir. 2000).

Finally, Defendants argue that Plaintiffs' various negligence claims must be dismissed as time-barred. We agree—but only in part. A three-year statute of limitations governs negligence claims in New York. *Midwest Mem. Group, LLC v. Int'l Fund Servs.*, 10 Civ. 8660, 2011 U.S. Dist. LEXIS 119428, at *8-9 (S.D.N.Y. Oct. 17, 2011). The statute of limitations begins to run when the injury first occurs. *Iacobelli Constr. v. County of Monroe, Rochester Pure Waters Dist.*, 32 F.3d 19, 27 (2d Cir. 1994). According to the allegations in the Complaint, Valentini first sustained an injury, allegedly as a result of Defendants' negligence, in July 2007, when he was forced to sell the stock he received as a result of the conversion of his airline-linked ELKS. Compl. ¶ 52. This loss occurred more than three years prior to the filing of this lawsuit, on

33

February 28, 2011. Valentini's negligence, negligent misrepresentation and negligent supervision claims must therefore be dismissed as time-barred.

The same is not true, however, of the negligence claims brought by Windsor, which, according to the Complaint, suffered its first loss only on March 26, 2008, when CPB first liquidated a portion of its note investments to satisfy a margin call. *Id.* ¶ 64. This is less than three years before Plaintiffs filed suit. As a result, the negligence claims raised by Windsor can proceed, while those raised by Valentini must be dismissed as untimely.

### 6. Negligent Supervision and Negligent Misrepresentation

Defendants also raise specific objections to Plaintiffs' negligent misrepresentation and negligent supervision claims. Defendants argue that the negligent misrepresentation claim must be dismissed because Plaintiffs have failed to demonstrate two of the three elements Plaintiffs must prove in order to succeed on a negligent misrepresentation claim in New York: first, "the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff." *J.A.O. Acquisition Corp. v. Stavitsky*, 863 N.E.2d 585, 587 (N.Y. 2007)); second, that Plaintiffs' reliance on the information provided them was reasonable. *Id.*[9]

This argument fails. We have already concluded that Plaintiffs have satisfactorily alleged the reasonableness of their reliance on Defendants' misstatements and omissions. *See* III.A.3. We have also found that Plaintiffs have plausibly established that Defendants owed them a fiduciary duty—at least with respect to those transactions governed by the Structured Notes Master Agreement. *See* III.C.2. This suffices to establish the "special relationship" element of

---

[9] The third element required to prove negligent misrepresentation in New York is "that the information was incorrect." *Stavitsky*, 863 N.E.2d at 587.

the negligent misrepresentation claim, with respect to those transactions. *See Jackson & Nash*, 976 F.2d 86, 90 (2d Cir. 1992) (identifying a "special relationship" as one in which one party owes the other a fiduciary duty); *Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*, 10 Civ. 2737, 2011 U.S. Dist. LEXIS 66419 (S.D.N.Y. June 22, 2011) (same).

Defendants also argue that Plaintiffs' negligent supervision claim must be dismissed because, even if Defendants owed Plaintiffs a duty to execute their transactions with reasonable care, they owed them no ongoing duty to supervise and monitor their investments. This argument misunderstands the nature of the tort of negligent supervision. It suggests that negligent supervision applies only to negligence stemming from a breach of a duty to supervise. Instead, negligent supervision is available as a derivative cause of action wherever an employee acts negligently and "committed [the negligent act] on the employer's premises or with the employer's chattels" and his or her employer "knew or should have known of the employee's propensity for the conduct which caused the injury" prior to the injury's occurrence. *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004). *See also Kenneth R. v. Roman Catholic Diocese*, 654 N.Y.S.2d 791, 793-794 (N.Y. App. Div. 1997) (noting that negligent supervision operates as an alternative form of derivative liability "[i]n instances where an employer cannot be held vicariously liable for its employee's torts"). The fact that CPB and CFSC brokers with whom Valentini and Windsor interacted owed them no ongoing duty "to monitor [their] nondiscretionary account," *De Kwiatkowski*, 306 F.3d at 1302, does not mean that Plaintiffs cannot raise a negligent supervision claim if they can show that CPB and CFSC brokers owed them a duty of some sort that they breached—and that the employer knew or should have known of their propensity towards such conduct and that the conduct took place on the employer's property or with its things.

In this case, however, Plaintiffs have alleged no facts to support such a claim. They have

not, for example, alleged any facts demonstrating that any of the named Defendants knew or

should have known of their stockbrokers' propensity for tortious conduct, prior to the

wrongdoing alleged in the Complaint. Nor have they established who the individual employees

upon whom the employer's derivative liability would be predicated may be.   Although we

disagree with Defendants' reasoning, we therefore grant their motion to dismiss the negligent

supervision claim.  However, we grant Plaintiffs leave to amend the Complaint, pursuant to Rule

15(a), to correct the deficiencies identified with respect to the claim of negligent supervision.

For the reasons provided above, we deny the motion to dismiss the negligent

misrepresentation claim, as it relates to those transactions governed by the Structured Notes

Master Agreement.

### 7. Conversion

Plaintiffs allege that Defendants committed the tort of conversion when they refused to

repay the money Plaintiffs lost as a result of their investments in the structured notes. Compl. ¶

123. This claim must be dismissed. Under New York law, to "withstand a motion to dismiss in a

conversion claim, a plaintiff must allege: '(1) the property subject to conversion is a specific

identifiable thing; (2) plaintiff had ownership, possession or control over the property before its

conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to

the alteration of its condition or to the exclusion of the plaintiff's rights.'" *Kirschner v. Bennett*,

648 F. Supp. 2d 525, 540 (S.D.N.Y. 2009).

Plaintiffs have alleged no facts demonstrating that Defendants had "ownership,

possession or control over" the money that Plaintiffs lost in their investments when Plaintiffs

demanded repayment. Even if we were to reconceive the claim as asserting that an act of

36

conversion took place when CPB liquidated Windsor's investments—investments which Windsor clearly had ownership rights in at the time—thereby satisfying the second element of the claim, Plaintiffs have alleged no facts demonstrating the third element of the claim: namely, that in liquidating Windsor's notes, CPB exercised "an unauthorized dominion" over them. Although the liquidation of Plaintiff's notes may have been unwelcome and surprising, it was in fact explicitly authorized by the Security Agreement that governed all of Windsor's loans. *See* Slipp Decl. Ex. C, ¶ V(2) ("If at any time… the bank deems the Collateral inadequate, impaired or insecure, then the Bank may… without notice or demand… appropriate the Collateral, sell the Collateral… hold the Collateral proceeds as substitute Collateral…"). In the absence of any facts demonstrating that the liquidation of Windsor's account was not only unwelcome but also "unlawful or wrongful," Plaintiffs' claim for conversion must be dismissed.

### 8. Unjust enrichment

Finally, Defendants move to dismiss Plaintiffs' unjust enrichment claim on the grounds that it is precluded by the fact that it arises out of actions governed by a valid and enforceable contract between the parties. We agree. Under New York law plaintiffs cannot prevail on an unjust enrichment claim when a valid contract governs the subject matter of a dispute between parties and no "legal duty independent of the contract itself has been violated." *Clark-Fitzpatrick, Inc. v. Long Island R. Co.,* 70 N.Y.2d 382, 389 (N.Y. 1987). Plaintiffs have not identified any duty, independent of the contract, that Defendants violated when they allegedly "charge[d]… excessive commissions and margin interest" and were as a result unjustly enriched. Compl. ¶ 138. Accordingly, the unjust enrichment claim must be dismissed.

37

## IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss the claims of federal securities and common law fraud against CGMI and Citigroup is granted. Defendants' motion to dismiss Plaintiffs' IAA, negligent supervision, conversion, breach of contract, and unjust enrichment claims is also granted. Defendants' motion to dismiss all other claims is denied, subject to the limitations set forth in this opinion. Leave to amend is granted with respect to those claims identified above.[10]

SO ORDERED.

Dated: December 26, 2011
      New York, NY

_____
U.S.D.J.

---

[10] The Court has considered all of the parties' other arguments and found them to be moot or without merit.

38